Russell Davis (SBN 177959)
PACIFIC JUSTICE INSTITUTE
29 Lakewood Ave.
San Francisco, CA 94127
Tel. (415) 310-6575
rdavis@pji.org

Kevin T. Snider (SBN 170988)
PACIFIC JUSTICE INSTITUTE
P.O. Box 276600
Sacramento, CA 95827
Tel. (916) 857-6900
Fax (916) 857-6902
ksnider@pji.org

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SELINA KEENE, MELODY FOUNTILA, MARK MCCLURE, <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO; LONDON BREED, Mayor of San Francisco in her official capacity; CAROL ISEN Human Resources Director, City and County of San Francisco, in her official capacity; DOES 1-100, <br><br> Defendants. | Case No.: 4:22-cv-01587-JSW <br><br> **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: July 8, 2022 <br> Time: 9:00 AM <br> Courtroom: 5 |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .....................................................................................................................1

ARGUMENT .............................................................................................................................1

    I. The changing definition of vaccines and vaccination ........................................................1

    II. The overwhelming evidence shows that the injections do not prevent transmission, infection, or reinfection in those who receive them ..........................................................2

    III. The injections are treatments, not vaccines ....................................................................3

    IV. The legal standard for a preliminary injunction .............................................................6

    V. Irreparable harm ...............................................................................................................6

    VI. Plaintiffs' cases are compelling .......................................................................................8

    VII. Plaintiffs had COVID-19 and now have robust natural immunity; therefore, the vaccine mandate as applied to them is irrational. Hiring back COVID-19 recovered and COVID-19 negative staff will not harm coworkers or endanger the public ..........10

        A. The vaccine mandate, applied to COVID-19 recovered Plaintiffs, is irrational ......10

        B. Plaintiffs have natural immunity ................................................................................11

    VIII. The vaccine mandate violates the unconstitutional conditions doctrine .....................11

CONCLUSION ........................................................................................................................12

# TABLE OF AUTHORITIES

**CASES**

*Beltran v. Myers*,
   677 F. 2d 1317 (9th Cir. 1982) ..................................................................................................6

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*,
   840 F.2d 701 (9th Cir. 1988) ................................................................................................7, 10

*City of Tenakee Springs v. Block*,
   778 F. 2d 1402 (9th Cir. 1985) ..................................................................................................6

*Costa Mesa City Employees Assn. v. City of Costa Mesa*,
   209 Cal. App. 4th 298 (Cal. Ct. App. 2012) ..............................................................................7

*Enyart v. Nat'l Conf. of Bar Examiners*,
   630 F.3d 1153 (2010) .............................................................................................................6, 7

*Enyart v. Nat'l Conf. of Bar Examiners*,
   2010 U.S. Dist. LEXIS 69613 (N.D. Cal. June 22, 2010, Case No. C 09 5191 CRB) .......6

*Gilder v. PGA Tour, Inc.*,
   936 F. 2d 417 (9th Cir. 1991) ....................................................................................................6

*Griner v. Biden*,
   Case No: 2:22-CV-00149-DAK (D. Utah filed March 4, 2022) ..........................................5

*Koontz v. St. Johns River Water Mgmt. Dist.*,
   570 U.S. 595 (2013) ................................................................................................................11

*Martin v. Int'l Olympic Comm.*,
   740 F. 2d 670 (9th Cir. 1984) ....................................................................................................6

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ................................................................................................................11

*Sabelko v. City of Phoenix*,
   846 F. Supp. 810 (D. Ariz. 1994) ..............................................................................................6

*Wilson v. Watt*,
   703 F. 2d 395 (9th Cir. 1983) ....................................................................................................6

*Winter v. NRDC*,
   555 U.S. 7 (2008) ......................................................................................................................6

**STATUTES**

28 C.F.R. 36.309 ...................................................................................................................7

42 U.S.C. § 300aa-1 ..............................................................................................................3

**OTHER AUTHORITIES**

Catherine M. Brown, et al., *Outbreak of SARS-CoV-2 Infections, Including COVID19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021*, MMWR MORB MORTAL WKLY REP 2021;70:1059-1062, https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w ...............3

Cory Stieg, *Dr. Fauci on CDC mask guidelines: 'We are dealing with a different virus now,'* CNBC (July 28, 2021), https://www.cnbc.com/2021/07/28/dr-fauci-on-why-cdc-changed-guidelines-delta-is-a-different-virus.html .....................................................................................4

FDA, *Coronavirus (COVID-19) | CBER-Regulated Biologics*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics...................3

FDA, *Coronavirus Treatment Acceleration Program (CTAP)*, https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap .......................3

*Immunization: The Basics*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm.................................................................2

*Immunization: The Basics* (archived version), CENTERS FOR DISEASE CONTROL AND PREVENTION, https://web.archive.org/web/20210826113846/https://www.cdc.gov/vaccines/vac¬gen/imz-basics.htm .......................................................................................1, 2

Jayanta Bhattacharya, MD, et al., *The beauty of vaccines and natural immunity*, SMERCONISH NEWSLETTER (June 4, 2021), https://www.smerconish.com/exclusive-content/the-beauty-of¬vaccines-and-natural-immunity ................................................................4

Madeline Holcomb, *Fully Vaccinated People Who Get a COVID-19 Breakthrough Infection Transmit the Virus, CDC Chief Says,* CNN HEALTH (August 6, 2021), https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.........................2

Noah Manskar, *Moderna boss says COVID-19 vaccine not proven to stop spread of virus*, NEW YORK POST (November 24, 2020), https://nypost.com/2020/11/24/moderna-boss-says-covid-shot-not-proven-to-stop-virus-spread/ ..........................................................................4

Patricia Adams, et al., *Who Are These COVID-19 Vaccine Skeptics and What Do They Believe?* EPOCH TIMES (October 20, 2021), https://www.theepochtimes.com/who-are-these-covid-19-vaccine-skeptics-and-what-do-they-believe_4043094.html............................................5

Pnina Shitrit, et al., *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*, EURO SURVEILLANCE (September 23, 2021), https://doi.org/10.2807/1560-7917.ES.2021.26.39.2100822..........................................................5

Richie Allen, *Oxford Scientist "It's Illogical & Unethical to Force Jab on NHS Staff,"* The Richie Allen Radio Show (September 9, 2021), https://richieallen.co.uk/oxford-scientist-its-illogical¬unethical-to-force-jab-on-nhs-staff/ .........................................................5

Sarah Knapton, *Delta variant has wrecked hopes of herd immunity, warn scientists*, THE TELEGRAPH (October 8, 2021), https://www.msn.com/en-gb/health/medical/delta-variant-has¬wrecked-hopes-of-herd-immunity-warn-scientists/ar-AAN9O4p .......................................4

The New England Journal of Medicine, *Resurgence of SARS-CoV-2 Infection in a Highly Vaccinated Health System Workforce,* N ENGL J MED 2021; 385:1330-1332 (September 30, 2021), https://www.nejm.org/doi/full/10.1056/NEJMc2112981 .....................2

Thomas Colson, *Top WHO scientist says vaccinated travelers should still quarantine, citing lack of evidence that COVID-19 vaccines prevent transmission*, BUSINESS INSIDER (December 29, 2020), https://www.businessinsider.com/who-says-no-evidence-coronavirus-vaccine-prevent-transmissions-2020-12?op=1 ...............................................................................4

**INTRODUCTION**

The current "vaccines" are really treatments that do not prevent infection, transmission, or reinfection of COVID-19. The treatments may hide symptoms of COVID-19; therefore, administrators needing to protect vulnerable workers will still need to test vaccinated workers to ensure that they do not have COVID-19. Because symptom outbreak can occur on the job, workers will still need to wear personal protective equipment (PPE) to prevent transmission of COVID-19 to others. PPE has been proven to prevent the transmission of COVID-19. The weight of medical and scientific evidence shows that PPE is the only way to prevent transmission of COVID-19. As Plaintiffs are more than willing to use PPE, the Defendants cannot carry their burden of moving forward on the issue of reasonable accommodation to the Plaintiffs' faith-based requests for accommodation.

Additionally, the mandate at issue violates the constitutional conditions doctrine, as the government may not condition employment "on a basis that infringes [an employee's] constitutionally protected interests." The government herein is burdening Plaintiffs' rights by conditioning their access to a job and career by insisting they take a treatment where ***there is no nexus between the stated government goal of preventing the spread of COVID-19 and the treatment itself.*** The government has given the Plaintiffs a Hobson's choice: lose your faith and keep your job, or keep your faith and lose your job. This unlawful choice needs to be enjoined.

**ARGUMENT**

**I. The changing definition of vaccines and vaccination**

The CDC has changed its definitions of "vaccine" and "vaccination" so that the injections would fit within the new definition. Until recently, the Centers for Disease Control defined a "vaccine" as "a product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease."[1] The CDC also previously defined

---

[1] *Immunization: The Basics* (archived version), CENTERS FOR DISEASE CONTROL AND PREVENTION, https://web.archive.org/web/20210826113846/https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last visited March 1, 2022).

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1

"vaccination" as "the act of introducing a vaccine into the body to produce immunity to a specific disease."[2] Both prior definitions fit the common understanding of those terms. To be vaccinated meant that the recipient should have lasting, robust immunity to the disease targeted by the vaccine.

But on September 1, 2021, the CDC quietly rewrote these definitions. The CDC changed the definition of a "vaccine" to: "A preparation that is used to stimulate the body's immune response against diseases."[3] The CDC also changed the definition of "vaccination" to: "The act of introducing a vaccine into the body to produce protection from a specific disease."[4] Thus, the CDC has eliminated the word "immunity" from its definitions of "vaccine" and "vaccination." The CDC did so because it recognizes that the injections do not produce immunity to the disease known as COVID-19.

This is a critical, factual, and legal distinction.

Since the injections do not stop the transmission of SARS-CoV-2 as a matter of fact, they are not "vaccines" as a matter of law. Instead, they are a therapeutic or medical treatment which Plaintiffs have a fundamental human right to refuse without fear of losing their jobs.

**II. The overwhelming evidence shows that the injections do not prevent transmission, infection, or reinfection in those who receive them.**

The CDC Director has admitted that the injections do not prevent infection or transmission of SARS-CoV-2, the virus that has been identified by various public health agencies as causing the disease known as COVID-19. "[W]hat [the vaccines] can't do anymore is prevent transmission."[5] The CDC has acknowledged that the "vaccinated" and "unvaccinated" are equally likely to spread the virus.[6]

---

[2] *Id.*
[3] *Immunization: The Basics*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last visited March 1, 2022).
[4] *Id.*
[5] Madeline Holcomb, *Fully Vaccinated People Who Get a COVID-19 Breakthrough Infection Transmit the Virus, CDC Chief Says,* CNN HEALTH (August 6, 2021), https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html (last visited March 1, 2022); *see also* The New England Journal of Medicine, *Resurgence of SARS-CoV-2 Infection*

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

2

The injections do not confer immunity but are claimed to reduce the severity of symptoms experienced by those infected by SARS-CoV-2. They are, therefore, treatments and not vaccines as that term has always been defined in the law.

**III. The injections are treatments, not vaccines.**

As the CDC has conceded by changing its own definitions of "vaccine" and "vaccination," the injections are not vaccines in the traditional sense. In fact, the FDA classifies them as "CBER-Regulated Biologics" otherwise known as "therapeutics" which falls under the "Coronavirus Treatment Acceleration Program."[7]

The injections are misnamed as "vaccines" since they do not prevent infection, re-infection, or transmission of the disease—the key elements of a vaccine. On the other hand, the CDC has publicly stated that the injections are effective in reducing the severity of the disease but not infection, re-infection, or transmission. Indeed, as noted above, the CDC has stricken the very word "immunity" from its definitions of "vaccine" and "vaccination." The injections are therefore a treatment, not a vaccine. However, this newly created CDC definition conflicts with the statutory criteria for a vaccine, which focuses solely upon immunity. In 1986, Congress passed 42 U.S.C. § 300aa-1, which established "a National Vaccine Program to achieve optimal prevention of human infectious diseases through *immunization*." (Emphasis added).

It is widely known and reported that the current injections do not create immunity that would prevent the transmission of the disease to others, as the following makes clear:

---

*in a Highly Vaccinated Health System Workforce,* N ENGL J MED 2021; 385:1330-1332 (September 30, 2021) https://www.nejm.org/doi/full/10.1056/NEJMc2112981 (last visited March 1, 2022).

[6] Catherine M. Brown, et al., *Outbreak of SARS-CoV-2 Infections, Including COVID19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021*, MMWR MORB MORTAL WKLY REP 2021;70:1059-1062, https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w (last visited March 1, 2022).

[7] FDA, *Coronavirus (COVID-19) | CBER-Regulated Biologics*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics (last visited March 1, 2022); *See also,* FDA, *Coronavirus Treatment Acceleration Program (CTAP)*, https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap (last visited March 1, 2022).

a. NIAID Director Dr. Anthony Fauci to NPR: "We know now as a fact that [vaccinated people with COVID-19] are capable of transmitting the infection to someone else."[8]

b. WHO Chief Scientist Dr. Soumya Swaminathan: "At the moment I don't believe we have the evidence of any of the vaccines to be confident that it's going to prevent people from actually getting the infection and therefore being able to pass it on."[9]

c. Chief Medical Officer of Moderna Dr. Tal Zaks: "There's no hard evidence that it stops [COVID-19 vaccinated people] from carrying the virus transiently and potentially infecting others who haven't been vaccinated."[10]

d. Professor Sir Andrew Pollard who led the Oxford vaccine team: "We don't have anything that will stop transmission, so I think we are in a situation where herd immunity is not a possibility and I suspect the virus will throw up a new variant that is even better at infecting vaccinated individuals."[11]

e. Jayanta Bhattacharya, MD, PhD, Professor of Health Policy, Stanford University: "Based on my analysis of the existing medical and scientific literature, any exemption policy that does not recognize natural immunity is irrational, arbitrary, and counterproductive to community health."[12]

---

[8] Cory Stieg, *Dr. Fauci on CDC mask guidelines: 'We are dealing with a different virus now,'* CNBC (July 28, 2021), https://www.cnbc.com/2021/07/28/dr-fauci-on-why-cdc-changed-guidelines-delta-is-a-different-virus.html (last visited March 1, 2022).

[9] Thomas Colson, *Top WHO scientist says vaccinated travelers should still quarantine, citing lack of evidence that COVID-19 vaccines prevent transmission*, BUSINESS INSIDER (December 29, 2020), https://www.businessinsider.com/who-says-no-evidence-coronavirus-vaccine-preventtransmissions-2020-12?op=1 (last visited March 1, 2022).

[10] Noah Manskar, *Moderna boss says COVID-19 vaccine not proven to stop spread of virus*, NEW YORK POST (November 24, 2020), https://nypost.com/2020/11/24/moderna-boss-says-covid-shot-not-proven-to-stop-virus-spread/ (last visited March 1, 2022).

[11] Sarah Knapton, *Delta variant has wrecked hopes of herd immunity, warn scientists*, THE TELEGRAPH (October 8, 2021), https://www.msn.com/en-gb/health/medical/delta-variant-has-wrecked-hopes-of-herd-immunity-warn-scientists/ar-AAN9O4p (last visited March 1, 2022).

[12] Jayanta Bhattacharya, MD, et al., *The beauty of vaccines and natural immunity*, SMERCONISH NEWSLETTER (June 4, 2021), https://www.smerconish.com/exclusive-content/the-beauty-ofvaccines-and-natural-immunity (last visited March 1, 2022).

f.  A study of a SARS-CoV-2 outbreak in July 2021 published in Euro Surveillance observed that 100% of severe, critical, and fatal cases of COVID-19 occurred in injected individuals. The authors stated that the study "challenges the assumption that high universal vaccination rates will lead to herd immunity and prevent COVID-19 outbreaks."[13]

g.  Dr. Martin Kulldorff, Professor of Medicine at Harvard Medical School: "The bottom line is that these vaccines do not prevent transmission."[14]

h.  Dr. Sunetra Gupta, Infectious Disease Epidemiologist and Professor of Theoretical Epidemiology at the University of Oxford:

> [I]t is really not logical to use [these] vaccines to protect other people . . . I don't think they should be forced to on the understanding simply because this vaccine does not prevent transmission. So if you just think of the logic of it, what is the point of requiring a vaccine to protect others if that vaccine does not durably prevent onward transmission of a virus?[15]

Plaintiffs herein are indebted to plaintiffs' counsel in *Griner v. Biden*, Case No: 2:22-CV-00149-DAK, U.S. District Court of Utah for the above argument. *See* Russell Davis Decl., Exhibit 1 (*New England Journal of Medicine* article on the resurgence of COVID-19 in a Highly Vaccinated Health System Workforce—emphasizing the importance of non-pharmaceutical interventions, such as masking and testing—the same remedy plaintiffs are proposing); *id*., Exhibit 2 (CDC document showing infection results in some vaccinated persons, suggesting masking in indoor settings—the same remedy that plaintiffs are proposing); *id*., Exhibit 3 (ABC News analysis showing COVID-19 deaths rising among the vaccinated). It is also well known that our Vice President received four (4) jabs and recently came down with COVID-19.

---

[13] Pnina Shitrit, et al., *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*, EURO SURVEILLANCE (September 23, 2021), https://doi.org/10.2807/1560-7917.ES.2021.26.39.2100822 (last visited March 1, 2022).

[14] Patricia Adams, et al., *Who Are These COVID-19 Vaccine Skeptics and What Do They Believe?* EPOCH TIMES (October 20, 2021), https://www.theepochtimes.com/who-are-these-covid-19-vaccine-skeptics-and-what-do-they-believe_4043094.html (last visited March 1, 2022).

[15] Richie Allen, *Oxford Scientist "It's Illogical & Unethical To Force Jab On NHS Staff,"* The Richie Allen Radio Show (September 9, 2021), https://richieallen.co.uk/oxford-scientist-its-illogical-unethical-to-force-jab-on-nhs-staff/ (last visited March 1, 2022).

### IV. The legal standard for a preliminary injunction

A plaintiff seeking a preliminary injunction must satisfy four factors: (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7 (2008) (cited in *Enyart v. Nat'l Conf. of Bar Examiners*, 2010 U.S. Dist. LEXIS 69613, at *3 (N.D. Cal. June 22, 2010, No. C 09 5191 CRB)).

Under the Ninth Circuit's test for issuing a preliminary injunction, the moving party must demonstrate the following:

1. The moving party will suffer irreparable injury if the injunctive relief is not granted;
2. The moving party has a substantial likelihood of succeeding on the merits;
3. An injunction will not harm the non-moving party more than it helps the moving party;
4. Granting injunctive relief is in the public interest.

*City of Tenakee Springs v. Block*, 778 F. 2d 1402, 1407 (9th Cir. 1985); *Martin v. Int'l Olympic Comm.*, 740 F. 2d 670, 674-75 (9th Cir. 1984).

In recent years, an alternative test has been articulated. Under that test, the moving party must demonstrate either (1) probable success on the merits and the possibility of irreparable harm; or (2) the lawsuit raises serious questions and the balance of hardship tips sharply in the movant's favor. *Gilder v. PGA Tour, Inc.*, 936 F. 2d 417, 422 (9th Cir. 1991); *City of Tenakee Springs*, *supra*, at 1407; *Martin*, *supra* at 675; *Wilson v. Watt*, 703 F. 2d 395, 399 (9th Cir. 1983); *Beltran v. Myers*, 677 F. 2d 1317, 1320 (9th Cir. 1982); and *Sabelko v. City of Phoenix*, 846 F. Supp. 810, 816 (D. Ariz. 1994). The Plaintiffs overwhelmingly satisfy either standard.

### V. Irreparable harm

Being prevented from pursuing a chosen profession can be irreparable harm for purposes of obtaining a preliminary injunction. *Enyart v. Nat'l Conf. of Bar Examiners*, 630 F.3d 1153, 1165-6 (2010). In *Enyart*, a legally blind law school graduate sought to take the California bar exam using assistive technology software. Her accommodation request was refused. She sued under the Americans with Disability Act (ADA). The district court found that, in the absence of

preliminary relief, Enyart would likely suffer irreparable harm in the form of (1) the loss of the chance to engage in normal life activity, i.e., pursuing her chosen profession, and (2) professional stigma. The court granted her preliminary injunction requiring the bar examiners to grant her request to use assistive technology. The examiners appealed. The appeals court ruled that the injunctions were properly issued. The court stated that the graduate was likely to succeed on the merits of her ADA claim and that 28 C.F.R. 36.309, which required administration of the exams so as to best ensure that the results accurately reflected the graduate's aptitude rather than her disability, was a reasonable interpretation of the "accessibility" requirement of the ADA. The court held that *Enyart* had demonstrated irreparable harm in the form of the loss of opportunity to pursue her chosen profession.

Similar injuries were discussed in *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709-710 (9th Cir. 1988). *Chalk* is a case where the denial of an injunction would have resulted in an individual "los[ing] the chance to engage in a normal life activity." Mr. Chalk was a teacher suffering from AIDS who was prevented from teaching because of his diagnosis. His employer sought to reassign him to an administrative position at the same rate of pay and benefits, but Chalk refused the offer and brought a lawsuit asking for an order "barring the Department from excluding him from classroom duties." *Id.* at 704. Chalk argued that the job he was offered did not utilize his skills, training, or experience, and that "[s]uch non monetary deprivation is a substantial injury which the court was required to consider." *Id*. at 709. The Court cited to discrimination cases and explained that there was ample support for the proposition that Chalk's "non monetary deprivation is irreparable." *Id.* At its core, Enyart's case is similar to Chalk's. Enyart, like Chalk, does not cite to any monetary injury, but rather focuses on being prevented from pursuing her chosen profession because of her disability. Chalk stands for the proposition that such harm can be irreparable for purposes of obtaining a preliminary injunction.

California courts have ruled that job loss qualifies as irreparable harm. *Costa Mesa City Employees Assn. v. City of Costa Mesa*, 209 Cal. App. 4th 298, 305 (Cal. Ct. App. 2012). The City of Costa Mesa planned to contract out a variety of city services, including street sweeping, graffiti

abatement, animal control, jail operations, special event safety, information technology, graphic design, reprographics, telecommunications, payroll, employee benefit administration, building inspection, and park, fleet, street, and facility maintenance. Employee Association members sought an injunction to prevent the outsourcing of jobs. The court of appeal held that a preliminary injunction was proper. Similar to the case before this Court, it was readily apparent that association members [union members in SF] were in serious peril of being terminated, given the city's decision to pursue its outsourcing plan [CCSF pursuing the vaccine mandate] and the many layoff notices that the city sent out. The prospect of terminations also supported a finding that the association [union members] would incur greater interim harm without a preliminary injunction than the city would if one were issued.

As shown below, the instant motion brought on behalf of Plaintiffs is on all fours with the above cases.

**VI.  Plaintiffs' cases are compelling.**

It was always Plaintiff Melody Fountila's desire to help people in need and to feel useful. From 1992 to 1999 she worked as an employment specialist and later as an employment administrator with the Northern California Service League. She supervised Pre-Release programs for incarcerated persons through a Jobs Plus contract with the California Department of Corrections. She personally visited San Quentin and both Pelican Bay State Prisons to supervise training programs such as truck driving and life skills (how to interview for a job, what to wear, resume creation, and how to answer questions in an interview). The goal of the programs was to reduce recidivism, and it was very successful. Melody Fountila Decl., ¶ 3.

Plaintiff Fountila was employed by CCSF on February 16, 1999. She worked as an employment specialist with the Human Services Agency, which is under the Workforce Development Division of the City. As an employment specialist, Plaintiff Fountila continued her prior work with people in need of work. Her job duties were to assist clients with finding employment opportunities, making sure they were prepared for interviews, and doing everything possible to enhance employment opportunities for them. She worked with Cal Works participants

using the Curtis & Associates curriculum to help people get back to work. Her work also included helping people to get off unemployment insurance; she would help by identifying work opportunities within the City or with private employers. Plaintiff Fountila always considered her work to be a career, not simply a job. *Id.* at ¶ 4.

From 1998 to 2004 Plaintiff Selina Keene worked for the Ella Hill Hutch Community Center as a Construction Apprenticeship Coordinator. She conducted weekly introductions to construction workshops in order to help place candidates into various construction-related union apprenticeship programs. Plaintiff Keene also worked with the county redevelopment agency to ensure that hiring was accomplished on an equal opportunity basis. She monitored the work sites to ensure that contractors were in compliance with hiring requirements. Selina Keene Decl., ¶ 2.

Plaintiff Keene was first employed by CCSF in August 2005 as an eligibility worker for the family and children's foster care program. Her duties included certifying eligible foster parents and foster care and helping them to obtain monetary and medical benefits to support their foster children. *Id.* at ¶¶ 3-4.

In 2007 Plaintiff Keene began working as an employment and training specialist with the Human Service Agency of San Francisco, Workforce Development Division. Her duties included assisting clients to obtain employment and training clients in techniques to secure job opportunities, which included job search and retention education. Her administrative functions included, but were not limited to, creation of resumes, cover letters, thank you letters, and employment aid materials for clients to utilize to obtain work in the field of their choice and experience. They also included creating case comments and updates utilizing Launchpad software and communicating and reporting client status with other support staff. As with Plaintiff Fountila, Plaintiff Keene always considered her work to be a career, not just a job. *Id.* at ¶ 5.

Both Plaintiffs requested, and were denied, religious and medical accommodations to the vaccine mandate. Fountila Decl. ¶¶ 9-11; Keene Decl. ¶¶ 8-11, 13-15. Plaintiffs' careers have been cut short due to CCSF's vaccine mandate. The failure to accommodate their medical and/or religious exemptions to the vaccine mandate has not allowed Plaintiffs to utilize their skills,

training, or experience, and that "[s]uch non monetary deprivation is a substantial injury which the court [is] required to consider." *See Chalk*, *supra*, at 709.

Plaintiffs satisfy either alternative test referenced above. Under those tests, the moving party must demonstrate either (1) probable success on the merits and the possibility of irreparable harm; or (2) the lawsuit raises serious questions and the balance of hardship tips sharply in the movant's favor. *See* Section IV above. Plaintiffs have established irreparable harm as a result of losing their careers. As the government cannot establish a nexus between taking the vaccine and transmission of COVID-19, the Plaintiffs have raised both serious questions of law and have established probable success on the merits. Because the cost to CCSF of such accommodation is either minimal or nothing, the balance of hardships clearly lies in their favor. As the Plaintiffs satisfy both tests, the Court should grant their Motion for Preliminary Injunction, either by mandating that CCSF accommodate Plaintiffs by requiring them to wear masks, test often, and wear PPE, or by mandating that CCSF allow Plaintiffs to telecommute to work, just as they did during the height of the pandemic.

**VII. Plaintiffs had COVID-19 and now have robust natural immunity; therefore, the vaccine mandate as applied to them is irrational. Hiring back COVID-19 recovered and COVID-19 negative staff will not harm their coworkers or endanger the public.**

**A. The vaccine mandate, as applied to COVID-19 recovered Plaintiffs, is irrational.**

Multiple extensive, peer-reviewed studies comparing natural and vaccine immunity have now been published. These studies overwhelmingly conclude that natural immunity provides equivalent or greater protection against severe infection than immunity generated by mRNA vaccines. Dr. Jayanta Bhattacharya Decl., ¶ 22.

Recovered COVID-19 patients have strong, long-lasting protection against severe disease if re-infected, and evidence about protective immunity after natural infection is at least as good as from the vaccines. Dr. Bhattacharya Decl., ¶ 7, page 4, lines 3-9. Requiring vaccines for COVID-19 recovered patients provides a limited benefit while exposing them to the risks associated with the vaccination. *Id.*

In summary, "the overwhelming conclusion of the pertinent scientific literature is that

natural immunity is at least as effective against subsequent re-infection as even the most effective vaccines." Dr. Bhattacharya Decl., ¶ 25. Therefore, the vaccine mandates *incorrectly* do not provide an exclusion for the naturally immune. *Id.* It makes no sense to require vaccines for COVID-19 recovered patients.

### B. Plaintiffs have natural immunity.

Plaintiffs have recovered from COVID-19 and have natural immunity. Fountila Decl., ¶ 7; Keene Decl., ¶ 12. Because Plaintiffs have stronger immunity against COVID-19 than can be supplied by the vaccines, the vaccine mandate, as applied to Plaintiffs, is irrational. Further, the vaccines may in fact be harmful to them. Dr. Bhattacharya Decl., ¶ 7, page 4, lines 3-9.

Plaintiffs were working full time during the height of the pandemic. A description of their work is contained in their declarations. Fountila Decl., ¶¶ 3-4; Keene Decl., ¶¶ 2-5. The Defendants cannot show that these Plaintiffs' continued employment will either harm them or the general public. Just the opposite is true. Failure to keep critical staff is harmful to the public.

We now know that the vaccines do not prevent the transmission of COVID-19. *See* Davis Decl., Exhibit 2 (CDC bulletin); Dr. Bhattacharya Decl., ¶ 34. As vaccinated persons transmit COVID-19 at the same rate as unvaccinated persons, it should be readily apparent that that CCSF's mandate is illogical. *See* Davis Decl., Exhibit 6 (*Lancet* article).

Natural immunity is more robust than vaccine immunity. The only explanation for CCSF's illogical insistence that COVID-19 immune persons take a vaccine is to coerce them into violating their faith. Because such coercion violates both the First Amendment and Title VII, Plaintiffs should be granted their Motion for Preliminary Injunction.

**VIII. The vaccine mandate violates the unconstitutional conditions doctrine.**

The government may not condition employment "on a basis that infringes [an employee's] constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."). The enumerated right at issue is Plaintiffs'

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

11

First Amendment right to practice their religion and to follow the dictates of their faith, as recognized by Title VII.

The government herein is burdening Plaintiffs' rights by conditioning their access to a job and career by insisting they take a treatment where there is no nexus between the stated government goal of preventing the spread of COVID-19 and the treatment itself. *See* Section II above.

**CONCLUSION**

Plaintiffs fall squarely within binding Ninth Circuit opinion. Plaintiffs have shown irreparable harm: Plaintiffs will lose their chosen profession if not granted an accommodation to the vaccine mandate. Unless this request for injunction is granted, Plaintiffs' life goals of helping people obtain employment will fall by the wayside due to the indifference of their employer. CCSF cannot demonstrate prejudice by allowing them to wear PPE at work or allowing them to continue telecommuting to work. Therefore, the balance of equities falls squarely on the Plaintiffs' side, and the injunction should be granted.

Plaintiffs have also shown that the vaccine mandate for COVID-19 recovered persons is irrational. The ostensible purpose of the vaccines is to prevent the spread of COVID-19; however, science has shown that both vaccinated and unvaccinated persons can spread the disease. If the purpose of the vaccines is to immunize persons to COVID-19 and to prevent them from overcrowding hospitals, then that purpose is fulfilled by natural immunity obtained by recovery from the illness itself. There is no reason to deny COVID-19 negative workers who have robust natural immunity from working. In short, there is no prejudice to CCSF by allowing naturally immune workers to continue working. This is an independent basis to grant Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted this 23rd day of May 2022.

/s/ Russell Davis
Russell Davis, Esq.
PACIFIC JUSTICE INSTITUTE

*Attorney for Plaintiffs*