DAVID CHIU, State Bar #189542
City Attorney
JONATHAN C. ROLNICK, State Bar #151814
Chief Labor Attorney
LAUREN E. WOOD, State Bar #280096
ADAM M. SHAPIRO, State Bar #267429
Deputy City Attorneys
Fox Plaza, 1390 Market Street, 7th Floor
San Francisco, California 94102-5408
Telephone:      (415) 554-4261 (Wood)
                (415) 554-3830 (Shapiro)
Facsimile:      (415) 554-4699
E-Mail:         lauren.wood@sfcityatty.org
                adam.shapiro@sfcityatty.org

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SELINA KEENE, MELODY FOUNTILA, MARK MCCLURE,<br><br>      Plaintiffs,<br><br>      vs.<br><br>CITY and COUNTY OF SAN FRANCISCO<br><br>      Defendant. | Case No. 22-cv-01587-JSW<br><br>**DECLARATION OF LAUREN E. WOOD IN SUPPORT OF DEFENDANT'S RESPONSE TO MOTION TO ENTER ORDER PURSUANT TO THE NINTH CIRCUIT'S MEMORANDUM**<br><br>Filed:              March 14, 2022<br>Trial Date:      None set |

I, Lauren E. Wood, hereby declare:

1.      I am a member of the bar of the state of California and counsel of record for Defendant City and County of San Francisco in this action ("the City").  I submit this declaration to support the City's Response to Plaintiffs' Motion to Enter an Order Pursuant to the Ninth Circuit's Memorandum ("City's Response Brief").

2.      Pursuant to the Court's July 6, 2023 Order allowing the City to take expedited discovery, Dkt. No. 85, I took the depositions of Plaintiffs Melody Fountila and Selina Keene on July 21, 2023 and July 24, 2023, respectively. Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the transcript of Ms. Fountila's July 21 deposition. Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from the transcript of Ms. Keene's July 24 deposition.

3.      At Ms. Keene's deposition, I introduced her religious vaccine exemption request as Exhibit 3. That exhibit is the same document authenticated by and attached to the Declaration of Brendan Lim as Exhibit 1. Likewise, I introduced the followed-up questions posed by Human Resources personnel and Ms. Keene's responses as Exhibit 4 during her deposition. That exhibit is the same document authenticated by and attached to the Declaration of Brendan Lim as Exhibit 2.

4.      At Ms. Fountila's deposition, I introduced her religious vaccine exemption request as Exhibit 3. That exhibit is the same document authenticated by and attached to the Declaration of Brendan Lim as Exhibit 4. Likewise, I introduced the followed-up questions posed by Human Resources personnel and Ms. Fountila's responses as Exhibit 4 during her deposition. That exhibit is the same document authenticated by and attached to the Declaration of Brendan Lim as Exhibit 5.

5.      It is the City practice to maintain the confidentiality of City employees' personnel records, including vaccine exemption requests. Prior to filing the City's Response Brief, I contacted Plaintiffs' counsel of record, Russell Davis, and advised him that the City intended to file Plaintiffs' vaccine exemption records in support of the City's Response Brief. I expressly identified the four deposition exhibits identified in Paragraphs 3 and 4, above, and also attached Exhibits 3 and 6 to Brendan Lim's Declaration, which are the City's denials of Plaintiffs' exemption requests and asked Mr. Davis to confirm that the City could publicly file such documents. At Plaintiffs' depositions, Mr. Davis did not designate any portions of the depositions confidential. Nevertheless, I also asked him to

confirm that the City could publicly file excerpts of Plaintiffs' deposition transcripts and to affirmatively identify any testimony he considered confidential. Mr. Davis responded that the only plaintiff information he considered confidential was their Social Security Numbers and "medical records."

6.      The City's COVID-19 Vaccination Policy ended effective August 23, 2023. Information regarding the end of the City's policy is publicly available at https://sfdhr.org/covid-19.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed August 25, 2023 in San Francisco, California.


      /s/      Lauren E. Wood      
      LAUREN E. WOOD

# EXHIBIT 1

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                    --oOo--

4

5  SELINA KEENE, MELODY FOUNTILA,    ) Case No.
   MARK McCLURE,                     ) 4:22-cv-01587-JSW
6                                    ) Related Case Nos.:
                        Plaintiffs,  ) 4:22-cv-03975-JSW
7                                    ) 4:22-cv-04319-JSW
            vs.                      ) 4:22-cv-04633-JSW
8                                    ) 4:22-cv-06013-JSW
                                     ) 4:22-cv-07455-JSW
9                                    ) 4:22-cv-07645-JSW
   CITY AND COUNTY OF SAN FRANCISCO; ) 4:23-cv-00211-JSW
10 LONDON BREED, MAYOR OF            )
   SAN FRANCISCO IN HER OFFICIAL     )
11 CAPACITY; CAROL ISEN, HUMAN       ) Volume I
   RESOURCES DIRECTOR, CITY AND      )
12 COUNTY OF SAN FRANCISCO, IN HER   )
   OFFICIAL CAPACITY; DOES 1-100,    )
13                                   )
                        Defendants.  )
14 _____ ) Pages 1 - 118

15

16            DEPOSITION BY ZOOM OF

17               MELODY FOUNTILA

18                JULY 21, 2023

19 REPORTED BY:

20 ANGIE M. MATERAZZI, CSR 13116

21 -------------------------------------------------------

22            JAN BROWN & ASSOCIATES

23   WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24 701 Battery St., 3rd Floor, San Francisco, CA 94111

25         (415) 981-3498 or (800) 522-7096

                                                    1

MELODY FOUNTILA - July 21, 2023

1              A P P E A R A N C E S

2   (ALL PARTIES APPEARING VIA VIDEOCONFERENCE)
        FOR PLAINTIFFS SELINA KEENE, MELODY FOUNTILA,
3       MARK McCLURE:

4           BY:  RUSSELL DAVIS, ESQ.

5           PACIFIC JUSTICE INSTITUTE

6           29 LAKEWOOD AVENUE

7           SAN FRANCISCO, CALIFORNIA 94127

8           Tel: 415.310.6575

9           Email: RDAVIS@PJI.ORG

10      FOR DEFENDANT CITY AND COUNTY OF SAN FRANCISCO:

11          BY:  LAUREN WOOD, ESQ.

12          ADAM SHAPIRO, ESQ.

13          OFFICE OF THE CITY ATTORNEY

14          1390 MARKET STREET, 5TH FLOOR

15          SAN FRANCISCO, CALIFORNIA 94102

16          Tel: 415.554.4261

17          Email: lauren.wood@sfcityatty.org

18          Email: adam.shapiro@sfcityatty.org

19      FOR PLAINTIFF CHARLOTTE RAE SANDERS:

20          BY:  BEN NORTH, ESQ.

21          BINNALL LAW GROUP

22          717 KING STREET, SUITE 200

23          ALEXANDRIA, VIRGINIA 22314

24          Tel: 703.888.1943

25          Email: ben@binnall.com

2

MELODY FOUNTILA - July 21, 2023

```
 1                   A P P E A R A N C E S
 2        FOR PLAINTIFF DAVID GOZUM:
 3               BY:  ARKADY ITKIN, ESQ.
 4               LAW OFFICE OF ARKADY ITKIN
 5               57 POST STREET, SUITE 812
 6               SAN FRANCISCO, CALIFORNIA 94104
 7               Tel: 415.640.6765
 8               Email: arkady@arkadylaw.com

 9         FOR PLAINTIFF DENISE DEBRUNNER:
10               BY:  ROBERT WEISENBURGER, ESQ.
11               LiMANDRI & JONNA
12               P.O. BOX 9120
13               RANCHO SANTE FE, CALIFORNIA 92067
14               Tel: 858.759.9930
15               Email: rweisenburger@limandri.com

16         FOR PLAINTIFF DENISE DEBRUNNER:
17               BY:  JOHN C. SULLIVAN, ESQ.
18               SL LAW, PLLC
19               610 UPTOWN BOULEVARD, SUITE 2000
20               CEDAR HILL, TEXAS 75104
21               Tel: 469.523.1351
22               Email: john.sullivan@the-sl-lawfirm.com

23          ALSO PRESENT:
24                 DAVID GOZUM, PLAINTIFF
25                 O'BRYANT MURALLES, DEPO TECHNICIAN
```

3

1    BE IT REMEMBERED that, pursuant to Notice of

2  Taking Deposition, and on Friday, July 21, 2023,

3  commencing at 10:06 a.m. thereof, before me, ANGIE M.

4  MATERAZZI, a Certified Shorthand Reporter, personally

5  appeared remotely

6                    MELODY FOUNTILA

7          _____

8  called as a witness by the Defendants, who, having been

9  first duly sworn, was examined and testified as follows:

10                    --oOo--

11              EXAMINATION BY MS. WOOD

12    Q.   Good morning, Ms. Fountila.  Am I pronouncing

13  your name correctly?

14    A.   You are.

15    Q.   I'm Lauren Wood.  I'm a deputy city attorney

16  with the San Francisco City Attorney's Office and I'm

17  representing the City and County of San Francisco in

18  this matter.

19         Have you been deposed before?

20    A.   Yes.

21    Q.   How many times?

22    A.   Once.

23    Q.   When was that, approximately?

24    A.   Approximately -- maybe five or six years ago.

25    Q.   Do you recall what type of matter your

5

1            MR. DAVIS:  Lauren -- Lauren, one question.  I

2    don't recall 9704 being in her declaration.

3            MS. WOOD:  Let's bring up the declaration,

4    then.

5            MR. DAVIS:  That's kind of a technical thing,

6    but...

7            MS. WOOD:  Can we go to the first page -- the

8    second page.  Sorry.  I believe it is in Paragraph 4.

9            (Complied.)

10           MR. DAVIS:  It is there.  I'm sorry.

11           MS. WOOD:  Okay.  Could we -- let's take that

12   back down.

13           (Complied.)

14   BY MS. WOOD:

15       Q.   All right.  Ms. Fountila, my question was:  Is

16   the 9704 Employment & Training Specialist position the

17   only position you held during your time at the City?

18       **A.   That was the position that I was in.  However,**

19   **you changed -- within that same position, you changed**

20   **job -- you changed doing particular types of work.**

21       Q.   Okay.  So the classification stayed the same,

22   but if I'm understanding, your job changed?

23       **A.   Yes.  Yes.**

24       Q.   Well, maybe let's do it this way and start

25   with when you -- let's focus on what your job duties

                                                           18

1    were when you first started at the City.

2              Could you just explain briefly what those

3    were?

4         A.   I started with -- taking a training with

5    Curtis & Associates, which is a training similar to a

6    path which is helping families that are on welfare

7    transition to employment and for training.

8         Q.   Okay.  How long did you have this role of

9    working with families who were on welfare?

10        A.   I've been doing this for over -- I want to say

11   30 years.

12        Q.   Okay.

13        A.   Before I started with the City and County.

14        Q.   So this aspect of working with families on

15   welfare, that was something that stayed constant through

16   your whole employment?

17        A.   My prior -- I worked with ex-offenders --

18   well, no.  I don't want to refer to them as

19   ex-offenders.  I would prefer to -- formerly

20   incarcerated.  I think that's the proper name.

21        Q.   So right now I want to focus on your

22   employment at the City, like the job --

23        A.   Okay.

24        Q.   -- you had at the City.

25              So in your role -- and maybe since you did

                                                              19

MELODY FOUNTILA - July 21, 2023

1    but the type of the person that I am, I tried to assist

2    them in any information that they needed.

3         Q.   Thank you for that.  So I understand what you

4    were describing was sort of after the pandemic hit

5    working from home.

6              Can we focus on before the pandemic when you

7    were in the office.

8              Do you have an estimate for how many -- how

9    large your caseload was, generally?

10        A.   Yeah.  So anywhere from 15 to 25.  Sometimes

11   it could be 30.

12        Q.   Okay.  And then prior to the pandemic, were

13   you meeting with clients in person?

14        A.   Yes.

15        Q.   How often were you meeting in person --

16        A.   Daily.

17        Q.   And approximately how many meetings were you

18   having per day?

19        A.   Well, because of how the setup is, it's -- we

20   meet in the morning.  It could be anywhere between six

21   to -- depending on how many people came to the workshop,

22   right?  So we meet in the morning, we go through

23   exercises, and we have discussions.  I do one-on-ones.

24   Give instructions on how to interview in employment.  I

25   sit down and evaluate a person on where they're at.  I

23

1  then dispense that information to my cohorts.  I can

2  request for a person to go to training or I can start

3  setting them up with getting their resume together.

4  Their interviewing workshop.  It's a variety of things

5  that happen all at the same time, at different times,

6  just depending on the flow of the day.

7          Q.   Thank you for that.

8               MS. WOOD:  I would like to bring your

9  declaration back up.  If we can see Exhibit 2 at

10  Paragraph 3, please.

11              (Whereupon Exhibit 2 was placed on the

12               screen.)

13  BY MS. WOOD:

14          Q.   So I want to bring your attention to

15  Paragraph 3, the first line.

16              And it says here, "It was always my desire to

17  help people in need and to feel useful."

18              Do you see that?

19          A.   Uh-huh.

20          Q.   And so did working for the City Human Services

21  Agency fulfill that desire that you had?

22          A.   Yes.

23          Q.   In what way?

24          A.   Because I love helping people.  I love seeing

25  people transition.  I love them understanding how

24

MELODY FOUNTILA - July 21, 2023

1    important their lives are and how they have a purpose, a

2    designed purpose, and that they brought their children

3    into this world and that -- now you have to lead the way

4    for them.

5              And I just -- I couldn't ask for a better

6    career to be in.  I couldn't ask for a better

7    opportunity to do the type of work that I do.  I love my

8    job.  I absolutely love my job.  It's -- I didn't -- it

9    wasn't a job to me because, you know, I just -- this is

10   where I thrived at, you know.  And I was able to give

11   that to the clients that I served and...

12        Q.   Thank you for that.  We had touched on this a

13   little bit before.

14             But prior to -- when you came to the City --

15   and it says in your declaration here, From 1992 to 1999,

16   you worked with the Northern California Service League;

17   is that correct?

18        A.   Yes.

19        Q.   And according to your declaration, you

20   supervised pre-release programs for incarcerated

21   individuals to provide the necessary training, such as

22   resume writing, interview skills to help these

23   individuals obtain employment upon release.

24             Is that an accurate summary of what you did?

25        A.   Yeah.  I was the administrator, but I also

25

MELODY FOUNTILA - July 21, 2023

1    conducted the life-skills workshops as well and I

2    supervised and I went out to four institutions,

3    San Quentin, the two Solano institutions and Pelican Bay

4    State Prison, where I did a pre-release workshop with

5    men in that position; and that was done quarterly.

6              But then when they came into our services or

7    they came from across the street, because our --

8    that is -- where we were located was right across the

9    street from the hall of justice.

10       Q.   Okay.  Now, it says on the last sentence of

11   your declaration here, at Line 13, "The goal of the

12   programs was to reduce recidivism and it was very

13   successful."

14             Do you see that?

15       A.   Yes.

16       Q.   So that must have been very rewarding work

17   that you were doing at that time?

18       A.   Absolutely.

19       Q.   Did this fulfill your desire that you had to

20   help people and feel useful?

21       A.   Yes.

22       Q.   Were you able to make the kinds of the

23   connections with clients that you had at the City with

24   these individuals who were going to be released and

25   starting fresh?

26

MELODY FOUNTILA - July 21, 2023

1     **A.     Yes.**

2     Q.    So would it be fair to say that although the

3     population that you were working with was slightly

4     different, because these were incarcerated individuals,

5     pre-release --

6     **A.    The population wasn't different, pretty**

7     **similar.   Incarcerated individuals have families and**

8     **so -- yeah.**

9     Q.    Okay.   I just want to -- I think we spoke over

10     each other a little bit, so I just want to --

11     **A.    Forgive me.**

12     Q.    That's okay.   It's my fault, too.   And so

13     we'll -- we'll both, you know, try to do better.

14          I just want to make sure I'm understanding.

15     So do I have it right that, in your view, the

16     populations you were working with, when you were working

17     with incarcerated individuals, it was very similar to

18     the people that you were serving when you were working

19     for the City; is that correct?

20     **A.    Okay.   Yes.**

21     Q.    That's correct?

22          Okay.   And you were mentioning their families.

23          Did you help support the families of these

24     individuals, also, in your role at the Northern

25     California Service League?

27

MELODY FOUNTILA - July 21, 2023

1      **A.   Yeah.   If it came up, definitely, yes.**

2            MS. WOOD:   We can take that down.

3            (Complied.)

4    BY MS. WOOD:

5       Q.   And now -- the only other job, other than the

6    City that's mentioned in your declaration, is the one we

7    just talked about that you started in 1992.

8            Did you have any other positions, any other

9    professional work that you did prior to joining the

10   Northern California Service League?

11           MR. DAVIS:   I think, Lauren, that's confusing.

12           Are you asking her before she worked for the

13   City?

14           MS. WOOD:   No.

15   BY MS. WOOD:

16      Q.   So before you worked -- prior to 1992, did you

17   have any other jobs before you joined the Northern

18   California Service League?

19      **A.   Yes.**

20      Q.   Could you -- let's maybe quickly go through

21   those chronologically.

22           Could you tell me the first job that you had?

23   And I'm interested in work sort of after -- you know,

24   post high school, not after-school jobs or anything like

25   that.  Something you would deem as more of a real job, I

                                                           28

MELODY FOUNTILA - July 21, 2023

1          Go ahead and answer.

2          THE WITNESS:  I went to a training.  I went to

3    a training.  I -- I -- I came home.  Okay.  So I came

4    home that -- in my fourth year, I came home, but I went

5    to college, because I had two classes that I needed to

6    take to graduate, and I went to San Francisco State

7    University.  But at the same time, I ended up getting

8    married.  And then I took those classes, but I didn't

9    finish getting my transcripts sent to -- you know, to be

10   able to finish getting my degree from Clark.  And I went

11   to another training for being a cash -- working for

12   Safeway.

13   BY MS. WOOD:

14        Q.   Okay.

15        **A.   And that was in Oakland, I think.**

16        Q.   So maybe let's go about this a different way.

17             So looking at sort of the jobs where you were

18   serving vulnerable populations, have you had any other

19   positions, prior to your work at the City, in which you

20   were doing similar work, serving vulnerable or at-need

21   communities?

22        **A.   Well, I -- so while I was at -- it's a little**

23   **strange, because it's the same employer, right?  So I**

24   **worked in a children's waiting room, where people who**

25   **had business to conduct before the judge would bring**

                                                          30

MELODY FOUNTILA - July 21, 2023

1    their children, and I would find resources for the

2    families when they brought the children in and

3    provide -- so that they wouldn't have to be in the

4    courtroom -- a place to be that was safe and fun and --

5    yeah.

6         Q.   Okay.  For how many years, approximately, did

7    you hold that position?

8         A.   I did that for a year.  And then I trained my

9    successor and I became an employment specialist with the

10   same company.

11        Q.   Okay.  So that was also Northern California

12   Service League?

13        A.   Yes, ma'am.

14        Q.   Okay.  And then we touched on your education.

15             Did you ever have an opportunity to complete

16   your degree?

17        A.   I did.

18        Q.   When was that?

19        A.   That was in 2011.  I went to Phoenix

20   University -- University of Phoenix and I obtained a

21   bachelor's of science in management to further my career

22   with the City and County of San Francisco.

23        Q.   Wonderful.  Have you done any other college

24   courses after receiving your degree in 2011?

25        A.   So before 2011, I did a training about drugs

31

MELODY FOUNTILA - July 21, 2023

1   entire time that you've been no longer working with the

2   City, that you would have to repay your pension benefits

3   that you received from SFERS?

4          A.   No.   I'm not aware of that.

5               MR. DAVIS:  Same objection.  Might call for a

6   legal conclusion.

7   BY MS. WOOD:

8          Q.   Are you currently employed anywhere?

9          A.   I did work temporarily for a nonprofit,

10  Aspire, working with an after-school youth program.

11         Q.   I think when you first logged in to the Zoom,

12  I saw that it said Aspire Youth Engagement Programs

13  Trainer next to your name.

14         A.   Yeah.

15         Q.   Is that -- are you -- you said you temporarily

16  worked there.

17              Do you still work there?

18         A.   Not now, no.

19         Q.   Will you begin working there again when the

20  school year starts up?

21         A.   I don't know.  It's left up to the executive

22  director.

23         Q.   When did you start working for Aspire?

24         A.   I don't know.  I want to say the beginning

25  of -- no.  Maybe February or -- or March of this year.

35

MELODY FOUNTILA - July 21, 2023

1    Q.   And when did you stop working for Aspire?

2    A.   Just since the June -- end the May, end of

3    June.

4    Q.   So when the school year ended?

5    A.   Yes.

6    Q.   Could you describe to me briefly what it was

7    that you did as a youth engagement programs trainer at

8    Aspire?

9    A.   Well, I facilitated -- the opportunities I did

10   have, one, is I facilitated a workshop for the -- oh, my

11   brain.  For the -- I forget what they're called now.

12        So you have people that are placed in the

13   schools that run the after-school program, right?  And

14   they're, like, mentors, right?  But that's not the name

15   for them.  I'm sorry.  My brain is not allowing me to

16   recall that.

17        So I did a training for them around customer

18   service, engagement, how to be -- what not to do, those

19   types of things like that, right?  And then I did that

20   one workshop for about -- I want to say about 30

21   participants.  I'm really trying to remember this name

22   of the -- what they're called, but I won't let that

23   deter me.

24        So then my job was to monitor -- go out to

25   different schools to see if they were doing what they

36

MELODY FOUNTILA - July 21, 2023

1  had been trained to do and making sure -- and then I

2  attended meetings that the executive director would

3  give, just so that I could make sure I translated that

4  same information to the mentors that were over the

5  students at the different schools.  I was probably --

6  probably eight schools that I might have to travel to.

7      Q.   Okay.  Did you find this type of work to be

8  rewarding?

9      A.   It's always rewarding when I can help

10  individuals transform.  Most of these individuals were

11  young, some of them just starting college.  I have

12  wisdom that I can dispense.  And any time I can bring a

13  person to a different level in their lives, with the

14  help of the Lord, then that gives me great joy.  I think

15  it's needed to guide young individuals in this life that

16  we're now in, which is -- can be very crazy and I think

17  my role was important.

18      Q.   Are you hoping that you will be able to go

19  back this school year?

20      A.   I don't know.  See, I'm trying to answer that

21  question myself.  I have a lot of things going on in my

22  life.  I'm trying to ascertain if I really want to work

23  or do I just want to try and build something of my own

24  or -- so I'm not sure.  So I'm asking the Lord to direct

25  me on what purpose He has for my life.

37

MELODY FOUNTILA - July 21, 2023

1     Q.   Okay.  So other than Aspire Youth Engagement,
2  have you held any other jobs or position since you left
3  the City?
4     A.   I did.  My daughter was getting into the
5  insurance business.  And so in order to help her, I
6  crunched my brain and I actually got a license for
7  insurance, but I've not sold any insurance yet.
8     Q.   Okay.
9     A.   But I tried to help her.
10    Q.   All right.  Have you applied for any other
11  jobs, apart from Aspire, since you left the City in
12  April of 2022?
13    A.   No.
14    Q.   Did you ever consider reaching out to your
15  former employer, Northern California Service League, to
16  see if they had any openings that would be suited to
17  your skills?
18    A.   Well, the thing is this:  I'm on the board of
19  the Northern California Service League, so I couldn't be
20  on the board and work for them.
21    Q.   Okay.  That makes sense.  So how long have you
22  been on the board?
23    A.   For a long time.  I think -- whatever amount
24  of time -- once I left the agency, which was maybe two
25  or three years later, the executive director, at that

38

MELODY FOUNTILA - July 21, 2023

1    time, stated she wanted me to be on board, so I obliged

2    her, which was -- it was my pleasure, because that type

3    of -- that -- that -- that is my line of work.  I

4    believe -- yeah.

5              I believe in what they did.  I believe in what

6    I used to do, and I think it was definitely something

7    that needed to continue, yes.

8        Q.   Okay.  So by serving on the board, would it be

9    fair to say that that enabled you to further the mission

10   of the type of work you were doing, but in a different

11   role?

12       A.   I could -- I think you could say that.

13       Q.   Okay.  After you left the City, did you look

14   to see if any other Bay Area cities or counties have

15   human services agencies that offer similar programs to

16   what the City of San Francisco was offering?

17       A.   I looked.  I think I looked -- I had so much

18   going on at the time.  I think I looked, but I didn't

19   apply for anything.  I was pretty distraught.  I even

20   believe I was depressed.  It's just -- it was just --

21   it's been difficult, you know.  I -- yeah.  It's been

22   difficult.

23       Q.   But other counties do have similar

24   positions --

25       A.   Yes, they do.

                                                        39

MELODY FOUNTILA - July 21, 2023

1     Q.   Are you aware of any, like, nonprofits in the
2  Bay Area that provide similar types of services that the
3  City of San Francisco was, you know, offering through
4  the Human Services Agency?
5     **A.   You said nonprofits?**
6     Q.   Yes.   Sort of doing employment training or
7  at-risk --
8     **A.   Not -- not that I can think of, off the top of**
9  **my head.**
10          MR. DAVIS:   Objection.   Calls for speculation.
11  BY MS. WOOD:
12     Q.   After you left the City's employment, at any
13  time, did you do any research to see if there were any
14  nonprofits in the Bay Area that were doing sort of
15  employment-related assistance and counseling services,
16  similar to the work you had been doing at the City?
17     **A.   I wouldn't call it research.   I was trying to**
18  **figure out what I was going to do with my life after my**
19  **career kind of got pulled out from underneath me, and**
20  **trying to manage my life, because -- yeah, they were --**
21  **there were other things going on.**
22     Q.   Okay.   I just want to make sure I understand.
23          So you said you wouldn't call it research, but
24  did you do anything like Internet searches or --
25     **A.   I think -- I want to say -- I think I looked**

40

1    **into the human services out here in Pittsburg, but I**
2    **didn't apply for any positions or anything like that.**
3    **Not that I can remember, yeah.**
4        Q.   Have you ever heard of a nonprofit called
5    Opportunity Junction that's in Antioch?
6        **A.   No.**
7        Q.   Okay.  I think we've been going about an hour.
8             Would you like to have a short -- would a
9    short break be okay?
10       **A.   Sure.  I would love that, so I can go to the**
11   **bathroom.**
12            MS. WOOD:  We can go off the record.
13            (Off the record at 10:57 a.m. and back
14             on the record at 11:07 a.m.)
15            MS. WOOD:  Are we back on the record?
16            MR. DAVIS:  Yes.
17            MS. WOOD:  Are you ready to go, Angie?
18            THE REPORTER:  Yes.
19   BY MS. WOOD:
20       Q.   So, Ms. Fountila, I want to switch gears a
21   little bit and talk about the COVID-19 vaccines that
22   were available in 2021 and 2022.  And I just want to
23   sort of make sure we have the same basic understanding,
24   in terms of -- you know, when we're using terminology.
25            Do you understand that there were three

41

MELODY FOUNTILA - July 21, 2023

1   vaccines available in the U.S.?

2        A.   I believe -- yes.

3        Q.   Okay.  Do you know what those different

4   vaccines are called?

5        A.   I think one was Moderna, Pfizer,

6   Johnson & Johnson.

7        Q.   Okay.  So when I'm asking these next set of

8   questions, if I use the term "COVID-19 vaccine," that

9   more general term, I want you to understand that I'm

10  referring to all three of the vaccines that were

11  available in the U.S. in 2021 and 2022, which would be

12  the Pfizer, the Moderna and Johnson & Johnson.

13           Does that make sense?

14       A.   It makes sense if they were vaccines that were

15  legitimate.

16       Q.   And now if I ask -- if I want to ask a

17  question about a particular vaccine, then I'm going to

18  use the name, like Pfizer, Moderna or Johnson & Johnson,

19  so that you can understand my question is specific to

20  that vaccine.

21           Does that make sense?

22       A.   Okay.

23       Q.   And then I would ask for clarity in your

24  responses, if you could do the same.  If you're talking

25  about all three, generally, you could use the general

                                                        42

MELODY FOUNTILA - July 21, 2023

1  term vaccines, but if you're talking about one specific

2  one, it would be really helpful if you could identify it

3  by name.

4        A.   Yes.

5        Q.   Thank you for that.  Do you have any concerns

6  about the safety of the Pfizer vaccine?

7        A.   Yes.

8        Q.   What are those concerns?

9        A.   They're unsafe and ineffective and what they

10 did to arrive at where they're at.  Because I don't

11 consider them vaccines.

12       Q.   Okay.  You don't consider Pfizer to be a

13 vaccine.

14       A.   No.

15       Q.   What do you consider it to be?

16       A.   I don't know what it is.  It's not -- it was

17 never -- they were never proven to be legitimate

18 vaccines that take 10 to 20 years to develop.

19       Q.   So is the fact that the development, as you

20 understand it, that the Pfizer vaccine was in a shorter

21 time frame, is that a source of your concern about

22 taking that vaccine?

23       A.   It's a concern, but it didn't matter.  My

24 concerns have completely different reasons for me not

25 taking any vaccine.

43

MELODY FOUNTILA - July 21, 2023

1      Q.   Okay.  So you said that you have concerns that

2  the Pfizer vaccine is unsafe.

3           In what ways do you believe it's unsafe?

4      A.   I've --

5           MR. DAVIS:  I'm going to object to the extent

6  that it calls for expert testimony -- expert scientific

7  testimony.

8           But go ahead and answer.

9  BY MS. WOOD:

10     Q.   And I'm just asking for what you believe.  Why

11  do you believe it's unsafe, you personally?

12     A.   They weren't proven to be legitimate vaccines.

13     Q.   When did you first start to feel those

14  concerns that the Pfizer vaccine was not a legitimate

15  vaccine?

16     A.   My main concern was how they derived the

17  vaccine and that was through aborted fetal tissues.

18  That's my concern.  And then there was 293 times they

19  tried to -- so that they could get a viable kidney in

20  order to use -- to do what they needed to do.  The child

21  was alive.  They did not want to use anesthesia because

22  it would mess up the kidney.  And that is what disturbed

23  me, because that is murder and that is against what I

24  believe in.

25     Q.   So that -- the description you just gave,

                                                      44

MELODY FOUNTILA - July 21, 2023

1    where did you get that information from?

2         A.   One is the National Geographic.  I got it from

3    several different reliable sources that I can't think of

4    right now, but that's the main thing.

5         Q.   And when did you first read that National

6    Geographic article?

7         A.   The National Geographic was recent.

8         Q.   So had you read the National Geographic

9    article before or at the time that you submitted your

10   vaccine exemption request?

11        A.   No.  I read things from -- online -- I'm

12   sorry.  Say that again.

13        Q.   No.  Go ahead.  You said you read things

14   online.

15             What websites were you reading?

16        A.   I can't recall a lot of this -- these things

17   that you're asking, but just know that that's my --

18   that's how I feel about this.  And then I'm just --

19   I'm -- okay.

20        Q.   So I had asked -- in my question I started

21   talking about Pfizer, but -- we'll talk about all the

22   vaccines.

23             So do you feel that all three vaccines,

24   Pfizer, Moderna and Johnson & Johnson, are unsafe?

25        A.   Yes.

45

MELODY FOUNTILA - July 21, 2023

1          Q.   Do you have any specific safety concerns about

2    them, and I'm not talking about the way they're

3    produced, but just in terms of safety concerns about the

4    vaccines themselves?

5          A.   Yes.

6          Q.   What are those safety concerns?

7               MR. DAVIS:   Objection.   Lauren, can you expand

8    on what you mean by "safety concerns."

9               MS. WOOD:   That's not really an objection.

10   BY MS. WOOD:

11         Q.   Ms. Fountila, do you understand the question

12   that I have --

13              MS. WOOD:   I'm asking her personally if she

14   was concerned about the safety of those vaccines.

15              THE WITNESS:   I'm concerned about the safety

16   of the vaccine, because nothing was proven.   I don't

17   even know if they were -- did any testing that was

18   relevant.   It was put together really quickly, when most

19   vaccines take 10, 15, 20 years.   And I wasn't going to

20   jump into something that I knew very little about.

21   BY MS. WOOD:

22         Q.   Did you have any concerns that if you were

23   vaccinated with one of the vaccines for COVID-19, that

24   it could be harmful to your health?

25         A.   Yeah.

                                                              46

MELODY FOUNTILA - July 21, 2023

1    Q.   Did you have any specific concerns about types
2  of harm that you thought might --
3    **A.   Because -- I'm sorry.**
4    Q.   Sorry.  I think we're talking over each other.
5  Let me finish my question.
6         Did you have -- were there any specific health
7  issues that you had in mind that you thought could
8  befall you if you took those vaccines?
9    **A.   So -- yes.  So there -- okay.  So the --**
10  **the -- the VAERS report, right, stated almost 500 and**
11  **something deaths, and that I did see.  For the**
12  **different -- one of the -- one of the Pfizer reports,**
13  **it's like 500 and something deaths.  And that was back**
14  **in 2020.  And, like, almost 900 and something -- I don't**
15  **remember off the top of my head, but injuries to people.**
16  **That was on the VAERS data reporting system, adverse**
17  **something, but it's V-A-E-R-S.**
18         **For another one of the vaccines, it was**
19  **determined like another amount of deaths and another**
20  **amount of injuries that was in the hundreds of**
21  **thousands.  So with just seeing that alone, I said, no,**
22  **no.**
23    Q.   Would it be fair to say that you were
24  concerned that if you took one of these vaccines --
25    **A.   I would not.**

47

MELODY FOUNTILA - July 21, 2023

1    correct?

2          A.   I think so.

3          Q.   Did you receive any treatments when you were

4    in the hospital?

5          A.   I did.

6          Q.   Do you recall what those treatments were?

7          A.   No.  I don't know.

8          Q.   Were you given any medications when you were

9    at Kaiser being treated for COVID-19?

10         A.   I was.

11         Q.   Do you recall the names of any of those?

12         A.   I recall one, because later -- I wasn't aware

13   that I was given this particular treatment, because I

14   would have denied it, and it's remdesivir.

15         Q.   Now, in Paragraph 7 of your declaration, you

16   also say that you've been told by doctors that you now

17   have natural immunity to COVID-19.

18         A.   Not only have I been told, I have documents.

19   Because I -- I have documented that I have natural

20   immunity antibodies against that, and I -- yeah, so...

21              MS. WOOD:  Okay.  We can take down this

22   exhibit.

23              (Complied.)

24   BY MS. WOOD:

25         Q.   What is your understanding -- and I know

                                                          53

1   you're not a scientist.   Just your own understanding of

2   what it means to have natural immunity to COVID-19.

3           What does that mean to you?

4       A.   That means once you receive a virus and get

5   it, your body is made up and you receive natural

6   antibodies against that virus that you received.   Your

7   body is uniquely and wonderfully made and it works for

8   you.

9       Q.   Do you believe that natural immunity is more

10  effective than vaccination in preventing the

11  transmission of COVID-19?

12      A.   I do.

13      Q.   When did you first come to believe that?

14      A.   I don't remember when I first came to believe

15  that, but I believe it.

16      Q.   And you've held that belief for some time?

17      A.   Yes.

18      Q.   What is the basis for your belief that natural

19  immunity is more effective than vaccination?

20          MR. DAVIS:   Objection to the extent it calls

21  for scientific or expert testimony.

22  BY MS. WOOD:

23      Q.   I'm just asking as to what you believe -- why

24  do you believe that natural immunity is more effective

25  than vaccination?

54

MELODY FOUNTILA - July 21, 2023

1    A.   I probably have, but I can't remember where
2  from.
3    Q.   So you don't recall anything that you --
4  specifically that you read?
5    A.   I can't remember at this time, no.
6    Q.   Have you had conversations with anyone about
7  the relative effectiveness of natural immunity from
8  prior COVID infection in comparison to the immunity
9  received from vaccination?  And I'll just make a caveat.
10  Conversations with anyone other than your attorney.
11    A.   Can you repeat that, please?
12    Q.   I'm just wondering if you've had conversations
13  with anyone about the effectiveness of natural immunity
14  versus vaccination?
15    A.   I've spoke -- my -- my pastor distributed a
16  lot of information to his parishioners.  We had weekly
17  meetings on Zoom, where he gave information about COVID,
18  about a lot of different things, yeah.
19    Q.   What kind of information did he give you about
20  COVID?
21    A.   I can't remember all of the information, but
22  we had weekly meetings and we talked about -- he put on
23  podcasts and information to provide us with informative
24  information about COVID, about what was going on, about
25  how our natural immunity was best.  A lot of different

56

MELODY FOUNTILA - July 21, 2023

1    information on a regular basis.

2         Q.   And did you listen to all these podcasts that

3    he was putting out?

4         A.   I sure did.

5         Q.   And was the information he was providing about

6    COVID, you had mentioned natural immunity, was that

7    scientific-type information?

8         A.   Scientific-type information from scientists,

9    doctors, legal counsel, the Senator Johnson from Texas,

10   Dr. -- oh, boy, I can't think of his name right now,

11   so...

12        Q.   So would it be fair to say that your pastor --

13   and this is Pastor Gistand -- was compiling information

14   from a variety of sources, different scientists,

15   legal -- you said, counselors or advisers, politicians,

16   and sharing that information with his congregation?

17        A.   Yes.

18        Q.   Do you think it was unfair that the City was

19   requiring you to get the COVID-19 vaccination when you

20   had already been infected with COVID-19?

21        A.   Yes.

22        Q.   Why do you think that?

23        A.   Because I had natural immunity --

24        Q.   So you think --

25        A.   -- that I had required -- I had asked for a

57

MELODY FOUNTILA - July 21, 2023

1   religious exemption.

2        Q.   Okay.  But I'm not asking about the religious

3   exemption right now.  I was just asking about natural

4   immunity.

5             So do you think that they should have exempted

6   you from getting the vaccine because of your natural

7   immunity?

8        A.   Certainly.

9             MS. WOOD:  Let's bring back up the

10  declaration, which is Exhibit 2.  And I want to go down

11  to Paragraph 13, which --

12             (Whereupon Exhibit 2 was placed on the

13              screen.)

14             MS. WOOD:  There it is.

15  BY MS. WOOD:

16       Q.   So I just want to draw your attention to the

17  last line of Paragraph 13, where it says, "Given my

18  natural immunity, there is no reason why I can't be

19  allowed to work."

20            Do you see that?

21       A.   Yes.

22       Q.   What did you mean by that statement?

23       A.   What I just stated.

24       Q.   So you felt that your -- you didn't pose a

25  risk to others, whether members of the public or

                                                        58

MELODY FOUNTILA - July 21, 2023

1    coworkers, because you had COVID in the summer of 2021?

2        A.   True.

3        Q.   Okay.

4        A.   Yes.

5             MS. WOOD:  Okay.  We can take that down.

6             (Complied.)

7    BY MS. WOOD:

8        Q.   You identify as a Christian, correct?

9        A.   I do.

10       Q.   Do you -- strike that.

11            How long have you been a Christian?

12       A.   I was raised in a Christian household.

13   However, I didn't have a personal relationship with God

14   and -- but in 1990, something very significant came into

15   my life and everything changed.

16       Q.   Okay.  So you would say since 1990 you've had,

17   what you felt, was a personal relationship with God; is

18   that correct?

19       A.   Yes.

20       Q.   Do you currently belong to a particular

21   denomination of Christianity?

22       A.   No.

23       Q.   Are you member of a church?

24       A.   Yes.

25       Q.   Which church is that?

59

MELODY FOUNTILA - July 21, 2023

1    if you were receiving a letter?

2          A.    No.

3          Q.    So we already noted that you did sign this

4    letter.

5                Did you read through the whole letter before

6    you signed it?

7          A.    I did.

8          Q.    And did you feel that all the statements in

9    the letter reflected your personal belief?

10         A.    I did.

11               MS. WOOD:  Okay.  I just want to take a

12   look -- if we could go up to the first page of the

13   letter, which is Page 4 of the document.

14               (Complied.)

15   BY MS. WOOD:

16         Q.    Do you see in the middle of the page, it says,

17   "Therefore, in my sincerely held belief as a spiritual

18   being with a Christian worldview, I cannot use any

19   product that takes its origin in abortion."

20               Do you see that?

21         A.    I do.

22         Q.    And what does that phrase "takes its origin in

23   abortion" mean to you?

24         A.    The way that it was developed.  It was

25   developed through murdering a child in a woman's -- from

74

MELODY FOUNTILA - July 21, 2023

1          THE WITNESS:  Okay.  Thank you.

2    BY MS. WOOD:

3        Q.    Do you feel that the responses you provided to

4    the City in these e-mails were truthful and accurate?

5        A.    Yes.

6              MS. WOOD:  So let's go back up to Page 10.  I

7    want to pause at the first No. 1.

8              (Complied.)

9    BY MS. WOOD:

10       Q.    So the first question here was, "Please

11   identify the specific religious tenet that prohibits the

12   COVID-19 vaccination."

13             Do you see that?

14       A.    Yes.

15       Q.    And you wrote in, "As stated in my exemption,

16   my body is the temple of God.  It is not to be subjected

17   to coercive experiments with clear danger and harm

18   already proven by the CDC/VAERS."

19       A.    Yes.

20       Q.    And so here in this form, you were identifying

21   that the reason you cannot receive the vaccine is

22   because of the clear danger and harm that the vaccine

23   poses, correct?

24       A.    Yes.  And I also say that the body is the

25   temple of the Holy Ghost, which is of God, and that

                                                          89

1    **comes from the Bible.**

2        Q.   Okay.  Let's go down to No. 5.  This question

3    asks:  "Do you regularly worship with others sharing

4    your beliefs about the COVID-19 vaccine?  If so, how

5    often and where are services generally held?"

6        **A.   I can't -- I can't state other people's**

7    **thoughts or opinions, but I do worship with other**

8    **believers on a regular basis.**

9        Q.   Okay.  And in response to this question, you

10   wrote, "This line of questioning is also irrelevant to

11   the matters at hand and appears to only serve some

12   data-gathering agenda."

13       **A.   Yes.**

14       Q.   Why did you write that it was irrelevant?

15       **A.   Because it is.  How many times I go to church**

16   **has nothing to do with you telling me -- it had nothing**

17   **to do with the current situation at hand.**

18       Q.   Why did you believe it had nothing to do with

19   it?

20       **A.   Because what does me going to church have to**

21   **do with you forcing me to take a vaccine?**

22       Q.   And then you said, "That it only -- "appears

23   to only serve some data-gathering agenda."

24            Can you explain to me what you mean by --

25       **A.   I think during that time there was some kind**

90

MELODY FOUNTILA - July 21, 2023

1    combination with others.

2          MR. DAVIS:  Objection.  You misstated her

3    response.

4          Go ahead.  You can answer.

5          THE WITNESS:  My mother gave me -- whichever

6    those are.  I haven't taken one in my adulthood that I

7    knowingly remember taking.

8    BY MS. WOOD:

9        Q.   Do you have children?

10       **A.   I do.**

11       Q.   You mentioned a daughter.

12            How many children do you have?

13       **A.   Three.**

14       Q.   And how old are they?

15       **A.   Thirty-eight, 35 and 30.**

16       Q.   Did you have your children vaccinated when

17   they were children?

18       **A.   I believe so.**

19       Q.   Did you do any research before having them

20   vaccinated to see whether or not those vaccines were in

21   any way connected to, you know, aborted fetuses?

22       **A.   No.  But I trusted my doctor and I went with**

23   **her suggestion to give my child a vaccination, yes.**

24       Q.   Okay.  Let's go to the next page, which is

25   Page 12.  I'm going to look at Question No. 5, which

                                                        92

MELODY FOUNTILA - July 21, 2023

1  says, "Many common medications were also developed using

2  the same type of technology used in the development of

3  the COVID-19 vaccine."  And then it lists a long list of

4  different medications.

5         Do you see that?

6     A.   I do.

7     Q.   Have you ever taken Tylenol before?

8     A.   Yes.

9     Q.   When's the last time you've taken Tylenol, do

10 you recall?

11    A.   Over -- it's been over five years, at least.

12 That's the minimum.  But I'm pretty sure it was longer

13 than that.

14    Q.   All right.  What about Pepto Bismol?  Have you

15 taken that before?

16    A.   I have.

17    Q.   When was the last time you've taken that?

18    A.   It's been a long time.

19    Q.   Do you have an estimate?

20    A.   Over five years.

21    Q.   So over five years would be approximately in

22 2018?

23    A.   I think so.

24    Q.   Okay.  Let's -- so the rest of the question

25 says, "Do your beliefs prohibit you from taking and will

93

MELODY FOUNTILA - July 21, 2023

1   you abstain in the future from taking these and other

2   similar medications?  If not, what tenet or belief

3   prohibits the use of the COVID-19 vaccine, but permits

4   the use of these other medications?"

5          And then in your response here, you say, "Let

6   me say, I've been making healthier choices for myself to

7   better my health and longevity in life."

8          Can you explain to me what you mean -- what

9   you meant by that statement?  What kind of healthy

10  choices have you been making?

11      A.   I lost weight.  I've come off of all

12  medications that I was ever taking when I was pain.  I

13  don't believe that they are going to assist me.  I only

14  believe that they will break my body down, so I no

15  longer take these things that jeopardize my health.  I'm

16  trying to get healthier.  I want to be healthier.  I've

17  changed my diet.  So I'm just trying to get my body in a

18  better state and I've been doing that for quite some

19  time.

20      Q.   When, approximately, did you start making

21  these new healthy lifestyle changes?

22      A.   Probably over 10 years, maybe 15 years I've

23  been trying to do things to better my health.

24      Q.   Okay.  So you mentioned you changed your diet?

25      A.   Yes.

94

MELODY FOUNTILA - July 21, 2023

1      Q.    In what ways did you change your diet?

2      A.    I stopped eating fast-foods.  I started

3   cooking from home.  I started going to the gym.

4      Q.    Okay.  I think you had mentioned you stopped

5   taking medication for pain.

6            Do you recall when you stopped taking

7   medication?

8      A.    I can't remember.  I want to say it was

9   somewhere in the mid-2000s.  Early 2000, somewhere

10   around in there.

11     Q.    Are there specific medications that you chose

12   to stop taking?

13     A.    Yes.  Norco.

14     Q.    And that was a choice for your health?

15     A.    That was a choice for my pain.

16     Q.    I mean, to stop taking it?

17     A.    Yes.

18     Q.    Okay.  And then as part of this change to

19   making healthier choices, when you made this change,

20   were you still taking over-the-counter-type medication,

21   such as Tylenol, aspirin, Advil?

22     A.    No.

23     Q.    When did you stop taking those types of

24   medications?

25     A.    I can't really say.  It's been a while, that I

95

MELODY FOUNTILA - July 21, 2023

1  **can remember.  I'm trying to think.  I did have hip**

2  **surgery, so I think maybe then there might have been**

3  **some type of medications that I took, and that was in**

4  **2017.**

5       Q.   Okay.  Since 2017, other than the time you

6  were hospitalized with COVID, have you taken any other

7  medication?

8       **A.   Not that I can remember, no.**

9       Q.   And is this choice to stop taking medication

10  part of your overall shift that you had to focus on

11  healthier choices and wellness?

12      **A.   Yes.**

13      Q.   I want to go back to your response.

14          After the sentence we just looked at, it says,

15  "If what you're saying is true, then society, as a

16  whole, should know this to make wiser choices."

17          Can you tell me what that sentence is in

18  reference to?

19      **A.   I mean, if you want to prolong your life, you**

20  **got to make better life choices, right?  It's as plain**

21  **and simple as that.**

22      Q.   Okay.  And then in response to this question,

23  you wrote, "The difference is that these products" --

24  which I assume means the drugs listed in Question 5 --

25  "are not being forced upon us at the threat of our

96

MELODY FOUNTILA - July 21, 2023

1               Is that -- is that different to you?

2        A.    Could you repeat that question, please.

3        Q.    So in terms of -- in terms of the medications

4    you may have taken in the past, that was your choice

5    whether or not to the take them, correct?

6        A.    Correct.

7        Q.    And do you feel that with the vaccine mandate

8    with the COVID-19, an objection you have to it is that

9    you felt you weren't being given a choice?  That it was

10   being forced upon you?

11       A.    I do feel that.

12       Q.    And you say here that this was a violation of

13   your privacy and basic human rights.

14             How did you feel that the COVID-19 vaccine

15   mandate was a right to privacy?

16       A.    I don't think I said that.

17       Q.    Well, what did mean by -- when you say, This

18   is a violation of my privacy?

19       A.    Well, Amendment 7 says that I have a right to

20   religious exemption, based on my convictions -- my

21   God-given conviction.  And my God-given conviction was

22   that this vaccine was detrimental and that I shouldn't

23   be forced between my career, my livelihood, and my body

24   being harmed, potentially.  I didn't want to take that

25   chance.

                                                        99

MELODY FOUNTILA - July 21, 2023

1              MS. WOOD:  Okay.  Let's go back up to the very

2     first page of this document.

3              (Complied.)

4     BY MS. WOOD:

5         Q.   So this was the first e-mail that we looked at

6     in this chain.  The one dated October 12th, 2021 that

7     you sent to Brenden Lim and copied Ms. Keene and other

8     union reps.

9              And I want to look at the second paragraph of

10    your e-mail, where you state that you never take the flu

11    shot.

12             Is that still true?

13        A.   I have never taken a flu shot.

14        Q.   Is there a particular reason why you do not

15    take the flu shot?

16        A.   Well, one, you get the flu when you take the

17    flu shot.  And I didn't see where putting a different

18    type of flu in me, every year, was going to be

19    beneficial to my health, so I didn't want to take that.

20        Q.   And then you also wrote there, "And today I

21    choose not to take any medications because they have

22    adversely affected my body and caused harm."

23        A.   Yes.

24        Q.   And we've already talked about your choice not

25    to take medications, but I think the part we haven't

                                                          100

MELODY FOUNTILA - July 21, 2023

1    addressed is this concept of adverse affects and harm

2    caused to your body.

3           Can you please tell me what medications you

4    believe have harmed you?

5       A.   I can't really say for sure.  All I know is

6    that my body was broken down to the point where I became

7    depressed.  I didn't want to -- I gained weight.  I felt

8    hopeless.  I wanted to clean my body up and I didn't

9    want to continually be affecting one thing or another

10   or -- you know, diminishing my health because of the

11   effects of the different types of drugs that I was --

12   might have been taking.

13      Q.   And do you recall what drugs you were taking

14   at the time that you were feeling those negative effects

15   in your body?  Do you recall?

16      A.   I remember the Norco, because that was the

17   pain medication that I was taking.  There was some other

18   things, but I can't think of them at this time.

19      Q.   Okay.  And so you stopped taking those drugs

20   to alleviate what you thought were negative effects in

21   your body; is that correct?

22      A.   Correct.

23      Q.   Now, I want to go back to the end of this

24   document, Page 13.  I think we got as far as Page 12.

25   Just to look at the final parts of this document.  I

101

MELODY FOUNTILA - July 21, 2023

1          A.   No.  No.  No.  Nobody was returning to work.

2     Not that -- not that I was privy to knowing.  None of my

3     coworkers -- we were all working from home.  We weren't

4     asked if we could come in to work from an office.  That

5     was not done.

6          Q.   Okay.  During the pandemic, Bart Ellison was

7     the program director for workforce development; is that

8     correct?

9          A.   Yes.

10         Q.   And so he supervised the division that you

11    worked under, right?

12         A.   Yes.  Right.

13         Q.   And do you recall in August 2021,

14    Mr. Ellison sending an e-mail to Human Services Agency

15    staff indicating that staff would be returning on -- the

16    workforce development division, returning to the office

17    in September of 2021?

18         A.   I want to say maybe.  I want to say, yeah.

19         Q.   And do you recall -- does it sound familiar to

20    you that people were going to be asked to come into the

21    office two days per week?

22         A.   Yep.  Because I was -- yes.

23         Q.   Okay.  And then did you also -- were you also

24    aware that in September of 2021, the City's department

25    of human resources had mandated that all staff work

                                                              115

MELODY FOUNTILA - July 21, 2023

1    on-site at least two days per week?

2        A.    Yes.   I was aware of that.

3      * Q    Okay.  I'm just going to check -- I may be

4    close to being done here.

5            So before we close for the day, I do want to

6    give you the opportunity to share what you discussed on

7    break.

8            So I'm going to ask you again.  We have taken

9    several breaks.  I know the last one you did not speak

10   with Counsel, but on the first -- I believe it was three

11   breaks you did speak with Counsel.

12           Will you please tell me the substance of what

13   you discussed with your counsel during those breaks?

14           MR. DAVIS:  Objection.  Attorney-client

15   privilege.

16           Do not answer the question.

17   BY MS. WOOD:

18     Q.  Will you follow your attorney's instruction

19   not to answer?

20     A.   Yes.

21           MS. WOOD:  Okay.  And we will be moving to

22   compel this, consistent with both Judge White's order

23   and decisions issued in the Northern District of

24   California.

25           That is all the questions I have for today, so

116

MELODY FOUNTILA - July 21, 2023

1                  CERTIFICATE OF DEPOSITION OFFICER

2

3          I, ANGIE M. MATERAZZI, CSR No. 13116, duly

4   authorized to administer oaths Pursuant to Section

5   2093(b) of the California Code of Civil Procedure,

6   hereby certify that the witness in the foregoing

7   deposition was by me duly sworn to testify to the truth,

8   the whole truth and nothing but the truth in the

9   within-entitled cause; that said deposition was taken at

10  the time and place therein stated; that the testimony of

11  the said witness was reported by me remotely and

12  thereafter transcribed by me or under my direction into

13  typewriting; that the foregoing is a full, complete and

14  true record of said testimony; and that the witness was

15  given an opportunity to read and correct said deposition

16  and to subscribe the same.

17          I further certify that I am not of counsel nor

18  attorney for either or any of the parties in the

19  deposition and caption named, or in any way interested

20  in the outcome of the cause named in said caption.

21          I hereby certify this copy is a true and

22  exact copy of the original.

23  Date: July 27, 2023

24  _____

25                  ANGIE M. MATERAZZI, CSR 13116

                                                        118

EXHIBIT 2

1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                     --oOo--

4

5   SELINA KEENE, MELODY FOUNTILA,    )   Case No.
    MARK McCLURE,                     )   4:22-cv-01587-JSW
6                                     )   Related Case Nos.:
                         Plaintiffs,  )   4:22-cv-03975-JSW
7                                     )   4:22-cv-04319-JSW
           vs.                        )   4:22-cv-04633-JSW
8                                     )   4:22-cv-06013-JSW
                                      )   4:22-cv-07455-JSW
9                                     )   4:22-cv-07645-JSW
    CITY AND COUNTY OF SAN FRANCISCO; )   4:23-cv-00211-JSW
10  LONDON BREED, MAYOR OF            )
    SAN FRANCISCO IN HER OFFICIAL     )
11  CAPACITY; CAROL ISEN, HUMAN       )   Volume I
    RESOURCES DIRECTOR, CITY AND      )
12  COUNTY OF SAN FRANCISCO, IN HER   )
    OFFICIAL CAPACITY; DOES 1-100,    )
13                                    )
                         Defendants.  )
14  _____    )   Pages 1 - 125

15

16               DEPOSITION BY ZOOM OF

17                    SELINA KEENE

18                   JULY 24, 2023

19  REPORTED BY:

20  ANGIE M. MATERAZZI, CSR 13116

21  --------------------------------------------------------

22               JAN BROWN & ASSOCIATES

23      WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24  701 Battery St., 3rd Floor, San Francisco, CA 94111

25          (415) 981-3498 or (800) 522-7096

                                                        1

SELINA KEENE - July 24, 2023

1              A P P E A R A N C E S
2       (ALL PARTIES APPEARING VIA VIDEOCONFERENCE)
            FOR THE PLAINTIFFS:
3
                BY:  RUSSELL DAVIS, ESQ.
4               PACIFIC JUSTICE INSTITUTE
                29 LAKEWOOD AVENUE
5               SAN FRANCISCO, CALIFORNIA 94127
                Tel: 415.310.6575
6               Email: RDAVIS@PJI.ORG
7
            FOR DEFENDANT CITY AND COUNTY OF SAN FRANCISCO:
8
                BY:  LAUREN WOOD, ESQ.
9               OFFICE OF THE CITY ATTORNEY
                1390 MARKET STREET, 5TH FLOOR
10              SAN FRANCISCO, CALIFORNIA 94102
                Tel: 415.554.4261
11              Email: lauren.wood@sfcityatty.org
12
13          FOR PLAINTIFF DAVID GOZUM:
14              BY:  ARKADY ITKIN, ESQ.
                LAW OFFICE OF ARKADY ITKIN
15              57 POST STREET, SUITE 812
                SAN FRANCISCO, CALIFORNIA 94104
16              Tel: 415.640.6765
                Email: arkady@arkadylaw.com
17
18          FOR PLAINTIFF DENISE DEBRUNNER:
19              BY:  JOHN C. SULLIVAN, ESQ.
                SL LAW, PLLC
20              610 UPTOWN BOULEVARD, SUITE 2000
                CEDAR HILL, TEXAS 75104
21              Tel: 469.523.1351
                Email: john.sullivan@the-sl-lawfirm.com
22
23           ALSO PRESENT:
24               DAVID GOZUM, PLAINTIFF
25               O'BRYANT MURALLES, DEPO TECHNICIAN
                                                        2

SELINA KEENE - July 24, 2023

1       BE IT REMEMBERED that, pursuant to Notice of

2   Taking Deposition, and on Monday, July 24, 2023,

3   commencing at 10:03 a.m. thereof, before me, ANGIE M.

4   MATERAZZI, a Certified Shorthand Reporter, personally

5   appeared remotely

6                     SELINA KEENE

7       _____

8   called as a witness by the Defendant, who, having been

9   first duly sworn, was examined and testified as follows:

10                      --oOo--

11              EXAMINATION BY MS. WOOD

12      Q.   Good morning, Ms. Keene.  My name is Lauren

13  Wood and I'm a deputy city attorney with the

14  San Francisco City Attorney's Office and I'm

15  representing the City and County of San Francisco in

16  this matter.

17      A.   Okay.

18          MS. WOOD:  Would the other attorneys like to

19  state their appearance?

20          MR. DAVIS:  Yeah.  This is Russell Davis for

21  plaintiff, Ms. Keene.

22          THE WITNESS:  Hi, Russell.  How are you doing?

23          MR. DAVIS:  Hi.  How are you doing?

24  BY MS. WOOD:

25      Q.   Ms. Keene, have you ever been deposed before?

4

SELINA KEENE - July 24, 2023

1   and County of San Francisco in August of 2005, correct?

2        **A.    That is correct.  I was eligibility worker.**

3        Q.    And during this deposition, just for the sake

4   of brevity, I will often refer to the City and County of

5   San Francisco as just the City.

6            If I do that, will you understand that I mean

7   your former employer, the City and County of --

8        **A.    Yes.**

9        Q.    -- San Francisco?

10       **A.    Yes, I do.**

11       Q.    Great.  That just makes it -- makes it easier.

12           THE REPORTER:  Ms. Keene, please wait until

13   she's finished with her question.  You keep jumping in.

14           THE WITNESS:  I thought she was finished.

15           MS. WOOD:  That's okay.  Sometimes my

16   questions are long.  We'll work on it.  We'll get there.

17   BY MS. WOOD:

18       Q.    So you mentioned your first position was as an

19   eligibility worker in the family and children's foster

20   care program, correct?

21       **A.    Correct.**

22       Q.    And then it lists in your declaration some of

23   your duties.  It was with providing eligible foster

24   parents and foster care providers with helping them get

25   their monetary and other medical benefits and support

                                                              17

SELINA KEENE - July 24, 2023

1   for their foster children?

2       A.   Yes.

3       Q.   Is there -- were there other duties that you

4   had that you recall?

5       A.   In regards to what position?

6       Q.   The eligibility worker position.

7       A.   Just deeming them eligible every month, making

8   sure that they had all of their benefits for the foster

9   children.  I did not interact, in a physical way, with

10  the foster parents.  That wasn't part of my duties.  The

11  eligibility portion is just to ensure that they qualify

12  for the benefit and then receive the benefit, and then I

13  do the calculations every month.

14      Q.   So was it more of an administrative function

15  that you were providing?

16      A.   Yes, it was more administrative.

17      Q.   And if we go up to Paragraph 2, you noted in

18  your declaration, "I was always interested in helping

19  people, especially those in need and underserved or and

20  underrepresented."

21           Do you see that?

22      A.   Yes.

23      Q.   Do you feel that your work as an eligibility

24  worker for the family and children's foster care program

25  fulfilled that desire to help people?

18

SELINA KEENE - July 24, 2023

1       A.   Yes, I did.

2       Q.   In what ways?

3       A.   Benefiting them, making sure that they were

4    self-sufficient.

5       Q.   And then after spending somewhere between one

6    and two years in the -- as an eligibility worker, you

7    moved over to the Human Services Agency in 2007; is that

8    correct?

9       A.   Correct.

10      Q.   Do you recall when in 2007 you switched

11   positions?

12      A.   It could have been March.

13      Q.   Okay.  And you noted in your declaration that

14   your job classification was 9704 Employment & Training

15   Specialist III.

16           Is that the only other classification you've

17   held with the City, other than the eligibility worker?

18      A.   Correct.

19      Q.   Was this a full-time civil service position?

20      A.   Correct.

21      Q.   And I know that you did, in your declaration,

22   you know, describing some of your job duties, but for us

23   on the record here today, could you just briefly

24   describe what your, sort of, main role and function was

25   as an employment and training specialist?

19

SELINA KEENE - July 24, 2023

1  know, so their income was so low that they qualified for

2  food stamps, which I actually qualified them to get into

3  the program for us to help assist them with employment

4  opportunity.

5      Q.   Okay.  I want to focus on sort of before

6  COVID, so, like, late 2019, very early 2020 and before.

7  I understand how things operated at work changed,

8  obviously, once everything shut down.

9          So in sort of pre-pandemic, do you have an

10 approximation of, sort of, how many different

11 individuals or clients you had on your caseload at any

12 given time?

13     A.   Goodness.  You got to talk about -- so at any

14 period, if you go all the way back to the beginning from

15 when I first started with the agency, I could have

16 up to -- anywhere from 20 to 30 people that I would

17 service per month and, of course, that changed.  And

18 then sometimes it gradually went down to maybe 15, 12,

19 and so -- yeah.  And then after -- you know, that's all

20 before the pandemic -- yeah, the pandemic.

21     Q.   Okay.  And you had mentioned a little bit

22 about some of the meetings.  So it sounds like you were

23 meeting with people in person prior to the pandemic.

24         How often were you having in-person meetings

25 with clients?

22

SELINA KEENE - July 24, 2023

1        A.   Prior to the pandemic, it was every day.   So
2    we had classes every day.   Each client is responsible
3    for so many hours per week that they have to
4    participate.   It depended on the family makeup.   Some
5    people were single, some had children.   But like I said,
6    it depended on the eligibility worker for the program
7    that referred them into our employment program that
8    would determine how many hours that they would
9    participate per week.
10        Q.   Okay.   And in terms of your desire to help
11   people, I assume that working at the Human Services
12   Agency in this capacity fulfilled that desire?
13        A.   It did.   It did.
14        Q.   And are you -- between the employment and
15   training specialist position and the eligibility worker
16   for foster care, have you ever worked for the City?
17        A.   No.
18        Q.   And then in Paragraph 2 of your declaration,
19   it says that prior to working for the City you worked
20   for the Ella Hill Hutch Community Center as a
21   construction apprenticeship coordinator from 1998 to
22   2004.
23        A.   Uh-huh.
24        Q.   Could you briefly explain what your role and
25   duties were when you worked at the Ella Hill Hutch

23

SELINA KEENE - July 24, 2023

1   Community Center?

2       A.   That was also putting individuals from the

3   community to work.  That actually was specified in -- to

4   the construction side of the house.  It wasn't general

5   employment.  Those were actual careers -- individuals, I

6   actually guided them, had them tested to identify their

7   levels of able -- the ability to get into the trades.

8           And so we had apprenticeships that we would

9   help them test.  And then if there was a nonlist trade,

10  say if it was something like carpentry or painting,

11  laborer, things of that nature, they could get into

12  those particular trades as apprentices.  And then as

13  long as they stayed within that capacity, working and

14  building their skill level, then they would journey out.

15          And so then my partner would take over,

16  because he was the journeyman coordinator for Ella Hill

17  Hutch.  So we tag-teamed to get community individuals

18  into an actual career of construction.  And that

19  depended on their abilities, their passion for the type

20  of work.

21      Q.   Did you find this work rewarding when you were

22  there?

23      A.   I totally did.  I loved the work,

24  especially -- especially working with contractors.  When

25  the contractors came, it was always -- we worked with

24

SELINA KEENE - July 24, 2023

1   the redevelopment agency to ensure that the contractors

2   hired from the community.  And, basically, they had to

3   hire half -- half their crews had to come from our

4   agency, so it made our jobs a lot easier.

5        Q.   And were the individuals who were coming to

6   seek services from Ella Hill Hutch Community Center,

7   were those people that you would consider underserved to

8   or underrepresented?

9        A.   Yes.

10       Q.   In what ways?

11       A.   A lot of them hadn't been working.  Some of

12  them were, you know, between jobs, some of them were low

13  income, had been on welfare, and they just wanted a

14  change.  They basically wanted to change.  They wanted

15  to upgrade their skills, so that was a perfect

16  opportunity for them to be able to accomplish that.

17       Q.   Would it be fair to say that the type of work

18  that you did at Ella Hill Hutch Community Center was

19  similar in some ways to the work you did at the City, in

20  that you were helping people who had certain

21  disadvantages, you know, find meaningful job

22  opportunities?

23       A.   Mostly definitely.

24            MS. WOOD:  We can take down this exhibit.

25            (Complied.)

                                                        25

SELINA KEENE - July 24, 2023

1    those?

2         A.   I was not able to do that.

3         Q.   What was your focus of study when you were at

4    each of those schools?

5         A.   Human studies.

6         Q.   Have you taken any other college courses?

7         A.   No, not since then.  I've been working and

8    focusing on my career, helping others, so I haven't had

9    the opportunity.  I'm sorry.  I did -- during the time I

10   worked for -- I'm sorry.  I did work for PIC for -- at

11   one time in between -- right underneath the eligibility

12   worker, I worked for PIC.  And then at the same time, I

13   was working for United, part-time.

14        Q.   What were you doing at PIC?

15        A.   Same capacity like I'm doing now.  The

16   homeless program there.

17        Q.   And then you worked at United?

18        A.   I was working for United during that time.

19        Q.   Do you have any technical training or

20   certificates that you've received?

21        A.   I did -- oh, my God.  That was a long time --

22   I did.  Do you know how old I am?  Let me go back.  I

23   believe -- I did a computer program and course at

24   Southeast, but that was way back in the early '90s.  And

25   I haven't done any other technical classes, except for

27

SELINA KEENE - July 24, 2023

1    speaking objection.

2              MR. DAVIS:  I didn't instruct her how to

3    answer the question, Counsel.  That's a speaking

4    objection.  I did not -- did not make a speaking

5    objection.

6              Please continue.

7              MS. WOOD:  My understanding of a speaking

8    objection, you know, anything other than just a short

9    statement as a basis for it, so -- but...

10             MR. DAVIS:  My understanding of speaking

11   objection is instructing the witness how to respond to a

12   question, via the use of the objection.  That's my

13   understanding.

14             Anyway.  Let's continue, please.

15   BY MS. WOOD:

16        Q.   All right.  Ms. Keene, are you currently

17   employed anywhere?

18        A.   No, I'm not.

19        Q.   Have you applied for any jobs since the time

20   that you retired from City service last spring?

21        A.   No, I have not.

22        Q.   Is there a reason why you haven't looked for a

23   new job?

24        A.   Because I'm still dealing with my -- well, I'm

25   still waiting.  I guess, I'm hoping that I can get my

                                                        31

1    job back, you know, my career back, my profession, my

2    passion.  You know, I want that back.

3            I don't -- you know, I have been suffering

4    from my chronic issues and -- you know, that's been

5    the -- the anxiety and the stress has also been a

6    factor.  But in reality, I would love to have my career

7    back helping people, doing what I've been doing almost

8    30 years.

9        Q.   Now, Ms. Keene, when we were looking at your

10   declaration, you had noted that the timeline didn't

11   include the time you were out on disability at the end

12   of your employment with the City.

13           Do you recall the approximate dates you were

14   out on disability?

15       A.   I had been out since the 27th of October, when

16   I had an atrial fib attack.  I suffer from Afib since --

17   and that's noted with the City.  They have all of my

18   FMLA paperwork.  I have several chronic conditions.  And

19   FMLA paperwork goes back to maybe 2009.

20           And so this latest condition arised in 2017

21   and they have been aware of that.  And as part of --

22   also with my anxiety disorder.  So when -- when I get

23   overly stressed, then I end up having an episode of

24   Afib.

25           And I was definitely going through a lot of

32

SELINA KEENE - July 24, 2023

1    job, I can perform my duties.

2              You know, working with my -- with the

3    population -- my population, as I used to call it, never

4    used to stress me out.  So it was just the other

5    bureaucracy that would be a problem, you know, dealing

6    with the agency, as a whole, because it was just so much

7    going on.

8         Q.   Thank you for that explanation.

9              Do you have any knowledge as to whether other

10   Bay Area counties or cities also have a Human Services

11   Agency that provides similar employment-related programs

12   to that which San Francisco provides?

13        A.   They do out here in Contra Costa.

14        Q.   And you live in Contra Costa County, correct?

15        A.   Yes, I do.

16        Q.   Did you look into -- see whether any other

17   counties, such as Contra Costa County, had open

18   positions doing similar work as what you've been doing

19   with San Francisco?

20        A.   When would you need -- I need to know when was

21   the period that you expected me to look for it.

22        Q.   Oh.  From the time you left City employment,

23   so April of 2022 to the present.

24        A.   No.  I had been not been really looking

25   elsewhere.

34

1      **A.    They are J.J., which equals Johnson & Johnson,**

2   **Moderna and Pfizer.**

3      Q.    For my next questions, if I use the term

4   COVID-19 vaccines, that general term, I want you to

5   understand that I'm asking about all three U.S.

6   vaccines, Pfizer, Moderna, Johnson & Johnson,

7   collectively.

8           Does that make sense?

9      **A.    It does.  But then the vaccine, unfortunately,**

10   **as far as my understanding, the information that I've**

11   **understood, is that not all of them are vaccines.**

12           **So I'm -- we can use that as a terminology for**

13   **now, but as far as my understanding, they're not all**

14   **licensed as vaccines.**

15      Q.    Okay.  Thank you for that clarification.

16           And then if I -- if my question is directed to

17   a particular COVID-19 vaccine, I'll use the name Pfizer,

18   Moderna Johnson & Johnson.  And if the answer you're

19   given -- the information you're conveying is specific to

20   a specific vaccine, I would ask that you also identify

21   it by name, so we have a clear record.

22           Does that make sense?

23      **A.    Yes.**

24      Q.    Okay.  Great.  Thank you.  Now, in 2021, after

25   the City and County of San Francisco issued their

36

SELINA KEENE - July 24, 2023

1    vaccine policy, did you have concerns about the safety

2    of any of the three COVID-19 vaccines?

3         A.    Yes.

4         Q.    Did you have concerns about all three?

5         A.    Yes.

6         Q.    And did the safety concerns that you had, were

7    they the same for all three or were they all different?

8         A.    Same.

9         Q.    Could you tell me, what were the safety

10   concerns that you had about the three COVID-19 vaccines?

11        A.    The data wasn't available about the safety;

12   that was one.  Two, the time frame that it took, which

13   was remarkably too short.  Generally, they all are

14   supposed to be tested over a 10-plus-year period of time

15   and they weren't.  That's the normal form, as far as I

16   know, of -- of making sure -- how they develop vaccines.

17   And then the other thing was -- is that they only

18   actually licensed the name of COMIRNATY, which was part

19   of Pfizer's, and COMIRNATY not ever available in the

20   United States.

21             If you look at any of the vials that were

22   utilized, as far as what the news used to say, none of

23   them said COMIRNATY.  So -- that was the only one that

24   was licensed.  Everything else, to my understanding, was

25   emergency use only.

37

SELINA KEENE - July 24, 2023

1           And if it's experimental, emergency use, then
2   you should have the ability to say yes or no to
3   something that you don't know anything about or the
4   ingredients of.
5       Q.   So the first thing you mentioned there was a
6   lack of available data related to safety; is that
7   correct?
8       A.   Correct.  Because I was looking for it.  You
9   know, I looked for it and I didn't get any.  And I asked
10  individuals who went and got it, Did they receive it,
11  because when you're getting ready to get some drug like
12  this, you're supposed to get information.  And a lot of
13  people said that they had not gotten any information, so
14  that was a red flag right there.
15      Q.   Okay.  And do you recall the time period in
16  which you were searching for safety data related to the
17  three vaccines?
18      A.   I think that started when they started
19  pushing.  I think that was like July -- June, July of
20  2021, I think -- or it was actually -- I think they
21  started giving it -- if I'm not mistaken, I think they
22  started giving shots, voluntarily, I think end of 2020
23  or -- I can't remember.  But -- I can't remember.  But
24  it was -- it was 2021, like June, July when the City
25  started -- all of a sudden they started to turn.  I

SELINA KEENE - July 24, 2023

1   said, Oh, wait a minute.  Hold on.  What's going on?

2          And so that's when I started paying attention

3   to the news and trying to find alternate news sources to

4   get information.  And then I was asking family and

5   friends.  They were like, No, they didn't give me

6   anything.  They just gave me a shot.  I was like, What?

7   That's not the way it's supposed to work.

8          Because usually any drug comes with

9   instructions, even the drugs that I take have the

10  instructions and it has a -- it has an insert in there

11  and it gives you, like, ingredients and stuff.  And they

12  weren't doing that.

13         And even when they were announcing, Go take

14  it, go take it, go take it -- most, if not all, drug

15  commercials that come on TV always talk side effects.

16  One thing that this COVID did not -- it did not talk

17  about side effects, what it can cause, none of that.

18  It's -- all the commercials didn't do that.  So they

19  were in violation right there for not being -- having

20  disclosure or transparency.  So, again, that was a red

21  flag.

22      Q.   When you say that was a red flag, the lack of

23  available information and safety data, is that a reason

24  that you did not want to get the vaccine?

25      A.   No.  The reason why is because once I found

SELINA KEENE - July 24, 2023

1    out that fetal cells was involved, that's when I said,

2    No.  That's definitely something -- but so it was -- it

3    was adding a factor, but it wasn't the primary.

4         Q.   Let's say hypothetically there were no fetal

5    cells at all in the vaccine, would you have still gotten

6    it, given the lack of available safety data?

7              MR. DAVIS:  Objection.  Calls for speculation.

8              THE WITNESS:  I don't know if I would have

9    gotten it.  Because, again, it was created in a too

10   short period of time.  It's something that you have to

11   be concerned -- and if you got a lot of common sense,

12   anybody would be concerned about that.

13   BY MS. WOOD:

14        Q.   Okay.  So let's see.  So there were a few

15   other reasons -- or a few other safety concerns you

16   mentioned.

17             The one you just now touched on again, that

18   the development was too rapid.  That normally, in your

19   understanding, a vaccine would take ten or more years to

20   develop and so that was a concern for you, correct?

21        A.   Correct.

22        Q.   So given that -- so I'm going to go back to

23   the same hypothetical.

24             If there were no fetal cells used in any of

25   the testing or production of the vaccine, given that

                                                          40

1   they were rapidly developed in -- I think it was maybe a

2   year or so, would you still have objected to taking the

3   vaccine because of the very rapid development?

4           MR. DAVIS:  Objection.  Asked and answered.

5           Go ahead.

6           MS. WOOD:  So this is specifically as to time

7   frame of the development is my question.

8           MR. DAVIS:  She answered your question.

9           But go ahead and answer it again.

10          THE WITNESS:  Response is the same and -- to

11  what I just said.  It would -- it would definitely be a

12  problem.

13  BY MS. WOOD:

14      Q.   Okay.  Thank you.  Now, you had mentioned that

15  the only one that was licensed was COMIRNATY.

16          And so it's your understanding that that

17  COMIRNATY was not available in the U.S.?

18      A.   Correct.

19      Q.   And where did you get the information that

20  informed you that COMIRATY was not available in the U.S?

21          How do you know that?

22      A.   Several new sources, media.

23      Q.   Do you recall the names of any of those news

24  sources that you --

25      A.   Not offhand, no.

                                                         41

1  they were providing?

2      A.   Well, yeah, I was checking the history, their

3  background, things of that nature.  Like, for instance,

4  Dr. Robert Malone, he's the creator of the SARS of

5  COVID, initial, when it first came out in the '80s.

6          So he was definitely talking -- he was on

7  several shows.  Of course -- unfortunately, because of

8  who owns legacy media, you know, he wasn't able to speak

9  there and talk to the masses.

10         But because there was a narrative about

11 everybody getting the -- that's where the red flag also,

12 for me, was going up.  Because I said, Wait a minute.

13 How come -- because everything has two sides of the

14 story and then it's the truth.  So why is it that both

15 sides of the story is not being explained on regular

16 news media?  Why is everybody in sync, lock step, saying

17 the same message over and over again?  Because that's

18 not the way this works.  Everybody has an opinion.  You

19 have two arguments and then they come to a conclusion.

20 But the way the media has been pushing it, it was

21 nothing but one-sided.

22         And so I -- everybody who -- like I said, you

23 know, I'm part of Baby Boomers or whatever, common

24 sense.  Anybody with common sense would say, Hey, why

25 aren't they talking about the other side?  Why aren't

43

SELINA KEENE - July 24, 2023

1    they allowing other doctors to have input.   Why are we

2    only seeing, for instance, Fauci?   So that was a problem

3    for me, so -- yeah.   So I had to look and find other

4    resources.

5         Q.    I just want to make sure I'm understanding

6    you.

7              So would it be fair to say that the sort of

8    absence of, what you say, both sides in sort of the

9    conventional media caused you to have concern about the

10   COVID-19 vaccine?

11        A.    Yes.

12        Q.    Did you have concerns that -- any specific

13   concern that the vaccine -- the COVID-19 vaccines would

14   be detrimental to your health if you took them?

15        A.    Well, spiritually, they were detrimental.

16   Because after finding out about the fetal cell

17   involvement, the murder that they utilize to create the

18   vaccines, that -- that put me in another place.   And I

19   said, There's no way that I would accept anything in my

20   body that was derived from that.   So that was -- I

21   just -- you know, that's what I felt.   That's where I

22   was.   And so -- you know, it wasn't healthy.

23              Unfortunately -- you know, then you started

24   hearing about deaths and -- from causes.   And, you know,

25   not deaths just because somebody had COVID, because I

44

SELINA KEENE - July 24, 2023

1  had COVID and I survived it.  It was only 1 percent of
2  people who actually passed from the actual COVID.  And a
3  lot of that had to do with protocols -- bad protocols in
4  hospitals.
5          But at the end of the day, then -- once the
6  vaccine -- so-called vaccines came into the picture and
7  people started dying or having adverse reactions -- and,
8  again, that wasn't being advertised in the media -- that
9  became a major, major problem, so -- yeah.
10  Q.   So did you believe that if you were -- setting
11  aside your spiritual objection to it.  Did you feel that
12  if you were to take the COVID-19 vaccine, that the risk
13  of physical harm or death or injury would be too great?
14  A.   Yes.  Because I already had preexisting
15  conditions that could do that anyway, so I didn't need
16  any help.
17  Q.   And in terms of the information about the
18  vaccine reactions or injuries or deaths, what -- where
19  did you get that information from?
20  A.   My alternative resources when stuff started
21  coming out, because they were hiding it in the
22  mainstream and that was -- here you go again with the
23  narrative.  Everybody is trying to get you to take
24  something that's going to cause you harm.  Yeah,
25  that's -- yeah.

45

SELINA KEENE - July 24, 2023

1      Q.    So even -- so let's say, hypothetically, there
2   was no use of fetal cell lines in the production or
3   development of it.  Would you still have objected to
4   getting the COVID-19 vaccine --
5             MR. DAVIS:  Objection --
6             MS. WOOD:  Let me finish my question.
7   Russell, let me finish.
8   BY MS. WOOD:
9      Q.    Okay.  I'll start over.  It's a different
10  question.
11            So, hypothetically, if the COVID-19 vaccine
12  did not have any fetal cell lines used in the production
13  or the development, would you still object to getting
14  the COVID-19 vaccine because of the number of adverse
15  reactions, deaths, injuries to the vaccine?
16            MR. DAVIS:  Objection.  Asked and answered.
17  This is now the third time you've asked the same
18  question, phrasing it slightly different --
19            MS. WOOD:  Will you stop with the speaking
20  objections?
21            MR. DAVIS:  Stop harassing my client.
22            MS. WOOD:  I'm not harassing.  This is a
23  different question.  It's asking --
24            MR. DAVIS:  It's not.
25            MS. WOOD:  Yes, it is.  And please stop with

46

1    question, okay?  You need to calm down, all right?  If

2    you can calm down.  I'm a Taylor Swift fan.  We could

3    listen to the song.

4                (Record read as requested.)

5                MR. DAVIS:  Calls for speculation.

6                THE WITNESS:  So let me just say that it is my

7    right -- my constitutional right whether or not to take

8    something that is appropriate or not into my body.

9                And without enough information, as well as the

10   adverse effects that has happened, no, I would not have

11   jumped up and took a jab for that -- for those vaccines.

12   Because it was -- they are endanger -- they are

13   endangering lives and causing harm, so I would not want

14   to put myself into that situation.  Especially with my

15   own medical history, I do not need help to die, so there

16   you are.

17   BY MS. WOOD:

18        Q.   Thank you for that answer.  I appreciate it.

19             So you mentioned earlier this morning and also

20   it's in your declaration that you did come down with

21   COVID-19 in January of 2022, correct?

22        A.   Correct.

23        Q.   And if you need me to -- actually, let's bring

24   back up your declaration and that's Exhibit 2 and we can

25   look at Paragraph 12.

                                                              48

SELINA KEENE - July 24, 2023

1    remember.

2       Q.   You didn't take any fever-reducing medication,

3    like aspirin, ibuprofen or acetaminophen?

4       A.   No.

5       Q.   Paragraph 12, the last sentence says, "I have

6    since recovered and now have natural immunity to the

7    disease."

8            What is your understanding of what it means to

9    have natural immunity to COVID-19?

10      A.   That is when your body obtains the virus and

11   the virus then -- the white blood cells that fight it

12   off end up, like, duplicating, where they can

13   actually -- if it ever enters your body again, they can

14   help fight it off.

15      Q.   And I think you mentioned earlier that you got

16   some type of antibody test --

17      A.   Yes, I did.

18      Q.   Do you remember when you had that test done?

19      A.   That was at the end of January -- either the

20   end of January or beginning of February; one of the two.

21           And I actually went down to the -- there's a

22   lab that I go to -- because I'm with UC -- UC is in

23   San Francisco.  They don't have a facility out here.  So

24   when I get my blood work, I go down the street to the

25   lab.  And I went and got an antibody test.  Talked to my

51

SELINA KEENE - July 24, 2023

1    doctor and had her set it up.  She sent over the request

2    and I took the antibody test.

3        Q.   Do you believe that natural immunity is more

4    effective than vaccination in preventing the

5    transmission of COVID-19?

6        A.   I do.  I understand that through a lot of the

7    information that came across alternative methods.  And

8    even the CDC mentioned that the -- natural immunity --

9    they finally, after months and months and months,

10   recognized natural immunity and said it was 22 times

11   better than the vaccine, so...

12       Q.   So when you mentioned that -- this 22 times

13   more effective figure, where was that -- where did you

14   get that particular statistic from?

15       A.   That was -- I think -- well, between CDC and

16   other news reports.  As a matter of fact, I think at one

17   point -- one of the people that I would watch, too, was

18   Facts Matter with Roman.  He's a news reporter that I

19   got a lot of information from as well.  Especially when

20   they had breaking news about natural immunity and things

21   that were better, as well as the reports of the adverse

22   events that were happening to people from getting these

23   so-called vaccines, so -- yeah.

24       Q.   Do you recall approximately when it was that

25   you were reviewing this information related to natural

                                                              52

SELINA KEENE - July 24, 2023

1    immunity?

2         A.   Well, as I -- you know, depending on --

3    generally, it was -- actually, I think it was a little

4    bit before I caught COVID, so that might have been in

5    November or December of 2021.  And then it was -- at one

6    point after I caught COVID or right at the end stages, I

7    started looking at stuff, because --

8              You know, at that point, when I ended up

9    having COVID, I notified my -- notified the employer and

10   let them know.  I sent them information.  I sent them my

11   actual -- my antibody test, so the City had all of that.

12   So I wasn't a danger to anybody.

13             So -- so at the end of the day, you know,

14   everybody that they wanted back at the site on

15   November 1st, who were vaccinated -- I started getting

16   reports about people who were getting COVID.  So they

17   was spreading it all around like it was a thing to do at

18   work, even though they were vaccinated.  So that wasn't

19   helping.

20        Q.   Did you think it was unfair that the City

21   required you to get vaccinated for COVID-19 after you

22   had already been infected?

23        A.   I definitely thought it was unfair.  I totally

24   thought it was unfair and -- especially with people

25   passing it around at work.  I was working telecommuting.

53

SELINA KEENE - July 24, 2023

1    I wasn't going to impact anybody, nobody.  So -- so it
2    was -- when they denied me, I was like, What is wrong
3    with them?  You know, first they violated my Title VII
4    rights and then here comes my medical and I'm having
5    problems, and so it was -- it's just ridiculous.  It was
6    ridiculous.  And then they're trying to enforce
7    something that's not a law.  It's not passed by
8    Congress.  So who do they think they are?  You're trying
9    to coerce people to do something that's going to harm
10   them and think that you're not going to be held
11   accountable.  That's not good.
12            My job turned into not having any integrity
13   and wasn't being held accountable.  They weren't being
14   transparent, so it was -- it's a major problem.  I had a
15   major problem with that.
16       Q.   And when you made your request for a medical
17   exemption, did you make that request on the basis of
18   having natural immunity to COVID due to prior infection?
19       A.   That too, yes.  I didn't need to do that in
20   order to perform my job.  We had been performing our
21   jobs even with COVID, in-person.  There was still people
22   that was there before they even required -- listen.  All
23   the City and County -- all the City and County employees
24   were working with COVID going on, okay?  So it didn't
25   make any sense.  All of a sudden now you want somebody

54

SELINA KEENE - July 24, 2023

1   to take a shot that doesn't even -- that's not

2   guaranteed -- it's not factual that it's safe and

3   effective.  Didn't have any data that it was safe and

4   effective.  They just kept on saying, Oh, it's safe and

5   effective, it's safe and effective.  What does that

6   mean, really?  Where's your backup?  Nobody provided it.

7   So it didn't make any sense.  So everybody is acting

8   like no -- common sense is out the window.

9           So, yeah, I was really, really -- excuse my

10  expression -- pissed off, because now you're

11  interrupting my career, my profession, my passion

12  because of some bologna stuff, that you don't have no

13  proof that it even works, and it didn't work.

14      Q.   Thank you for that.

15           MS. WOOD:  I think now -- since we've been

16  going for an hour and 20 minutes, let's take a short

17  break.

18           How about we come back in ten minutes?  Does

19  that work for everyone?

20           MR. DAVIS:  Okay.

21           (Off the record at 11:19 a.m. and back

22            on the record at 11:31 a.m.)

23  BY MS. WOOD:

24      Q.   All right.  Ms. Keene, I want to talk a bit

25  about your job and job duties during the pandemic now.

                                                        55

SELINA KEENE - July 24, 2023

1    driving two hours, drive home two hours.  I did not miss

2    that.  So -- yeah.  That was -- that was the good thing.

3    Just be ready for work like you normally would, but

4    you're at home.

5              It's ironic, because I -- I wanted -- I tried

6    to get that a long time ago, but then all of a sudden

7    here's, you know, COVID and then that -- it created that

8    environment, so -- yeah.

9         Q.   Now, were all of the clients of the Human

10   Services Agency served, were they all able to meet

11   virtually or did you have some that didn't have access

12   to, like, a phone or a computer or Internet?

13        A.   Most of them all had phones, but not everyone

14   had computers, so that was challenging.

15             When there was -- I believe they had -- you

16   know, they could go down to -- because 170 Otis was

17   open.  I think they had like a skeleton crew coming in

18   there, but that was way after everybody was sheltered in

19   place.  I think everything just kind of got closed up

20   first.  And then they had disaster workers that --

21   whoever was a disaster worker, they were dispatched to

22   certain areas to help assist clients, the underserved

23   population.  And then our department tried to continue

24   on as usual with helping with jobs and stuff.

25             But it was -- all that was kind of hard,

                                                              57

SELINA KEENE - July 24, 2023

1   because the COVID also closed businesses down, you know,

2   so people -- you know, employers couldn't even hire

3   because, you know, they were told to -- like, you can't

4   have anybody come to your business, so it was definitely

5   a negative impact on everyone.

6           Q.    Do you recall in November 2020, the Human

7   Services Agency opening -- or reopening its campus at

8   1320 Mission Street?

9           A.    I cannot recall whether or not they opened.  I

10  know eventually they did, but I can't remember if it was

11  in November.

12          Q.    Okay.  But do you recall them opening at some

13  point in 2020?

14          A.    Wait a minute.  At some point in 2020.  I just

15  don't know exactly when that was.  It could have been

16  2020 or 2021, one of the two.  I -- like I said, it

17  was -- if they did, it was a very big skeleton crew,

18  hardly anybody there, because they were in fear of

19  people catching COVID from each other.

20              And then I think -- I did know that

21  eventually -- and I still can't -- call the times, the

22  date or the year, but I do remember -- you know, any

23  clients that -- in retrospect to, like, not having a

24  computer, that they would have to make an appointment to

25  go in in order to get access to a computer.

58

SELINA KEENE - July 24, 2023

1      Q.   Okay.  So you're not sure exactly when --

2      A.   At some point, yeah.  Like I said, I can't --

3  don't even get me started.  I can't remember the dates.

4      Q.   That's fine.  Do you know how this, sort of,

5  limited reopening for these appointment-only visits was

6  staffed?  Was it by volunteers or do you have any

7  knowledge about that?

8      A.   Well, I'm not management, so I don't -- I

9  can't recall that.  I can't recall what they did.  You

10  know, I wasn't in charge of that, so, unfortunately,

11  yeah -- no.

12     Q.   That's all right.  Did you ever volunteer to

13  come work on site when they had these limited in-person

14  appointments?

15     A.   No, I didn't go in.  Because, again,

16  driving -- I mean, it didn't make any sense.  I think it

17  was -- anybody that was more readily available that

18  lived in the community that was closer by.  I think that

19  that -- I think they were, at that point, kind of fair

20  about it, so -- yeah.

21     Q.   Okay.

22     A.   I just continued my work like I was doing,

23  telecommute.

24     Q.   Now, during the pandemic, was Bart Ellison the

25  program director for workforce development at the Human

59

SELINA KEENE - July 24, 2023

1  Services Agency?

2      A.   Yes.

3      Q.   And so he was -- had -- I believe he wasn't

4  your direct supervisor, but he was maybe --

5      A.   **He was -- he was over all of us.  You know, we**

6  **had our direct supervisors or manager -- direct**

7  **supervisor, manager and then -- you know, then he was**

8  **over all -- everybody, so -- yeah.**

9      Q.   Okay.  Do you recall, in approximately August

10 of 2021, Mr. Ellison sending an e-mail to all of the

11 Human Services Agency staff announcing that the

12 workforce development division would be returning to the

13 service office in September?

14     A.   **I can't remember that.  I -- I don't recall.**

15 **I think eventually an e-mail did come out, but I cannot**

16 **remember whether it came from him or whomever.  I don't**

17 **know.  But sometimes stuff -- if it didn't go out to**

18 **everybody -- he might have sent it to the managers and**

19 **then the managers would send it to their teams, so --**

20 **yeah.  I can't quite remember that part.**

21     Q.   Okay.  But do you recall that there was a time

22 in the fall of 2021 when employees were being required

23 to return on site two days a week?

24     A.   **I don't remember initially if it was two days**

25 **or one day.  I do remember that they were eventually**

60

1    going to be recalled.  I think it was going to be a
2    rotation.  I do remember that.  But I don't know if it
3    was actually two or one day a week.  I thought it was,
4    like, initially one day a week and then they were going
5    to increase it to two days.

6        Q.   In 2021, did you ever return to any on-site
7    work?

8        A.   No, I did not.  I was still telecommuting.

9        Q.   And was that because to return to on-site work
10   you need to be vaccinated?

11       A.   I'm not sure if -- well, I know they wanted
12   everybody to be vaccinated.  But, again, I was not
13   vaccinated.  I had not received the jab.  I did not come
14   back to work telecommuting -- on site.  And like I said,
15   I don't remember everybody coming back to work.  I think
16   there was some other kind of deadline or something like
17   that.  Might have been initially September, but I think
18   it went -- then I think they pushed it to November.

19       Q.   Okay.  Thank you for that.  I appreciate the
20   clarification.  And I know it's hard during the COVID
21   years to pinpoint specific times --

22       A.   Yeah.  So much happened, so it was -- yeah.

23       Q.   Yeah.  All right.  You identify as Christian,
24   correct?

25       A.   Yes.

61

SELINA KEENE - July 24, 2023

```
 1   Paragraph 8.
 2              (Whereupon Exhibit 2 was placed on the
 3              screen.)
 4   BY MS. WOOD:
 5        Q.   So it says here, "The current COVID-19
 6   vaccines were derived from aborted fetal stem cells."
 7   And you state, "I will not take a vaccine derived from
 8   murdered children, because I'm a Christian.  I believe
 9   in the sanctity of life."
10              Could you explain to me what your
11   understanding of what it means -- that the COVID-19
12   vaccines were derived from aborted fetal stem cells,
13   what does that mean?
14        A.   They used murdered children's stem cells to
15   create a vaccine.
16        Q.   And is that true for all three, Pfizer,
17   Moderna and Johnson & Johnson?
18        A.   Yes.
19        Q.   And do you have an understanding as to whether
20   the production process was the same for all three
21   vaccines or if it differs?
22        A.   I don't know how it differed.  All I know is
23   that they all use the same aborted fetal stem cells in
24   order to supposedly create it.  I'm not a scientist.  I
25   don't know that.  I just know that that was utilized.
```

                                                          64

SELINA KEENE - July 24, 2023

1      Q.    Do you have an understanding or belief as to
2   whether the Pfizer vaccine actually contained, like,
3   physical matter from aborted fetal stem cells in the
4   vaccine itself?
5      A.    My understanding is -- my understanding is
6   that it was created -- now, whether it still has the
7   aborted fetal cells in it, as far as I know -- some
8   people have -- some scientists say yes, some say no.
9   I'm not sure, but I would not take any vaccine that had
10  any murdered fetal cells in it.
11     Q.    Okay.  I just want to clarify that, because I
12  think -- I'm a little confused, because you said you
13  wouldn't -- so do you believe that it -- that the Pfizer
14  vaccine does have aborted fetal stem cells in it?
15     A.    Yes.
16     Q.    And what about Moderna?  Do you believe that
17  it has aborted fetal stem cells in the vaccine?
18     A.    Yes.
19     Q.    And for Johnson & Johnson, do you believe that
20  it has aborted fetal stem cells in the vaccine?
21     A.    Yes.
22     Q.    If aborted fetal stem cells were not actually
23  in the physical material of the vaccine, that it had
24  only been used for testing, would that be okay with you?
25     A.    No.

65

SELINA KEENE - July 24, 2023

1        A.    Right.  Yeah.  I used a lot -- I used

2    basically a lot of the verbiage from the letter, yeah.

3        Q.    Okay.  When you filled out your exemption

4    form, you took some --

5        A.    Right, right.

6        Q.    So I want to understand, if you could tell me,

7    how it is that you came to obtain this letter.

8            Did you reach out to someone at Grace Bible

9    Church to get it?  Could you just walk me through how

10   that happened.

11       A.    Yeah.  I reached out to Pastor Jesse.  He had

12   been providing, you know, information, along with

13   information I was obtaining from alternative news

14   sources, about what was going on during the pandemic.

15   And so -- you know, he wanted people to have this

16   information -- that it was actually expert

17   communications from doctors and scientists that he would

18   provide their videos, podcasts, interviews, things of

19   that nature for us to understand and get our own --

20   getting our own view about what we need to do for

21   ourselves, period.  Something that the mainstream media

22   was never doing.

23            And like I've already mentioned in my previous

24   testimony, it was always one-sided and there's always

25   two sides, so he was helping provide the opposite or the

74

SELINA KEENE - July 24, 2023

1    other side of the spectrum about -- about the COVID

2    plandemic -- excuse me -- pandemic.

3           And so along -- between him and other

4    resources, like I said, alternative news, we were coming

5    to our own conclusions about what was really going on

6    and what needed to happen and how to protect ourselves

7    and, you know, stuff -- you know, you can talk to your

8    family about -- you know, about how to move forward,

9    so -- yeah.  All of this information was very vital and

10   valuable during that period of time.

11        Q.   I think I heard you use a term plandemic

12   instead of pandemic.

13           What do you mean by plandemic?

14        A.   That's my own opinion that it was planned.

15   Okay.  This whole thing was man-made, planned.  Once we

16   found out that it came out of a lab and it was bio

17   weaponry, it was planned.  It's not nothing that came

18   from nature.

19           So anything that man does is planned.  It's

20   not coming from God or Mother Nature.  It's coming from

21   a person, creating something to harm somebody or

22   something else, so that's why I called it planned.

23        Q.   And who do you believe planned this?

24        A.   Well, you know -- hey, now you've got to leave

25   it to Fauci, NIH.  I mean, you never know.  They were

75

SELINA KEENE - July 24, 2023

1   taking tax dollars -- our tax dollars and funding it for

2   gain-of-function research, so -- and, you know, you got

3   Rand Paul, the Senator over there, he's talking about it

4   in Congress all the time.

5          You know, all of this -- like I said, it

6   wasn't nothing that came naturally from nature.  So

7   whether it started in America or then got switched over

8   to Wuhan and then they finished that over there, that's

9   created by man.  That's why I said plandemic, because

10   bio weaponry is a man-made product.  That's not anything

11   that's a natural product.

12      Q.   Okay.  So in terms of the part that was

13   planned, is just -- does your understanding of that just

14   extend to the actual COVID-19 virus or are there

15   additional elements to this plan?

16      A.   I'm -- I'm -- I'm -- I'm -- my opinion -- my

17   opinion is that it was created for this virus, the

18   virus -- as you know, like I said, you've got Robert

19   Malone, who created the initial one.  Remember that.  So

20   you go from that to what it is now.  Robert Malone

21   stated -- he said, had he known that they were going to

22   use it for this, he would have never created it.  There

23   you go.

24      Q.   When you say "created," what are you referring

25   to?

76

SELINA KEENE - July 24, 2023

1      A.   The original SARS 1.  This is SARS 2.  SARS 1.

2  He's the one that's responsible for creating the SARS 1.

3  So what he created it for wasn't for this extent.  So

4  now they've created SARS 2, the -- Fauci, like I said,

5  his organization, NIH, which he's retired from now, is

6  responsible for using tax dollars to help fund

7  gain-of-function research that caused this whole new

8  virus, so that's my opinion.

9      Q.   Okay.  Thank you for clarifying that.

10          Now, you had noted that Pastor Jesse Gistand

11  had been providing a lot of information and podcasting

12  videos.

13          Was the information that he put out something

14  that you regularly viewed or listened to?

15     A.   Yeah.  From time to time, like I said, I

16  listened -- I got his information and I got the

17  alternative news information that -- information that

18  kind of coincided with what he -- what he provided.

19          And some of his information, I had already

20  got.  So he was showing -- just kind of like replaying

21  some of the videos that I had already seen from some of

22  the scientists and doctors who was trying to give

23  alternative answers and information that legacy media

24  wasn't putting out on regular TV.

25     Q.   And so was, generally, the type of information

77

SELINA KEENE - July 24, 2023

1  that Pastor Jesse was sharing, was it scientific or

2  medical information related to COVID-19 and the vaccine?

3      A.    Correct.

4      Q.    Was he sharing information from politicians as

5  well?

6      A.    There was occasionally a politician, I think,

7  but, generally, it was scientists and -- and doctors.

8      Q.    Okay.  Going back to the letter, here.  So you

9  said that you reached out to Pastor Jesse.

10          Do you recall whether that was a phone call,

11  an e-mail or how you reached out to him?

12      A.    E-mail, possibly.  But, generally, when I

13  attended the -- because he had in-person -- when he had

14  the informational sessions, that's, generally, when I

15  reached out was in person.

16      Q.    Okay.  If you had e-mailed him, would you

17  still have that e-mail?  Would you have kept that?

18      A.    I don't know.  I can't recall right now.

19      Q.    Okay.  That's fine.  And so when you asked him

20  about the letter, did you already -- was he offering to

21  give out letters of this nature?

22      A.    I didn't know that he was giving out -- I

23  didn't know.  I just know that I was going to ask him

24  since he was being very supportive.  And so I asked.

25  And so I said, Can you, you know, provide a letter for

78

SELINA KEENE - July 24, 2023

1    its origin in abortion."

2           Do you see that?

3        **A.   Yes.**

4        Q.   So there are numerous other vaccines and

5    medications that use fetal stem cells from aborted

6    fetuses in the research and development of them.

7           Do you do anything to ensure that none of the

8    other medications you take use aborted fetal stem cells?

9           MR. DAVIS:  Objection.  Facts not in evidence.

10   BY MS. WOOD:

11       Q.   You can go ahead and answer.

12       **A.   I'm not aware of which medications have --**

13   **have or don't have stem cells them in.**

14       Q.   So my question is a little bit different.

15           I wanted to know if before you take a

16   medication, do you do research into whether or not fetal

17   stem cells are used in the production of that particular

18   medication?

19       **A.   So before I take a medication that is**

20   **prescribed to me, I ask my doctor about the safety and**

21   **the effectiveness of the medication.  I'm very leery**

22   **now -- and actually prior to COVID, because certain**

23   **medications have been -- for me, I've had, like, certain**

24   **bad reactions.  So that's a question that I have with my**

25   **health care provider.  So my health care provider has**

                                                          81

SELINA KEENE - July 24, 2023

1    been very up front and trustworthy, to this point, to a

2    certain degree.  And so I trust my health care provider

3    not to give me something that's going to kill me or that

4    I'm going to disagree with it.

5            So if it happens to be something that I

6    disagree with, then I'll always ask her for an

7    alternative medicine.  That's what I usually do.

8    Q.   I just want to make sure that I'm getting an

9    answer to the question that I asked, since your answer

10   focused a lot on safety and effectiveness.

11           Have you told your medical provider that you

12   object to using any medications that used fetal cell

13   lines in their development?

14   A.   I have spoken to my doctor about fetal cells,

15   but -- but I did not tell her that I object to taking

16   them, but her response -- I'm sorry.  I have to say

17   this.

18           Her response is -- is that I wouldn't

19   purposely give you anything that I know for sure has

20   anything in it.  So at that point, I never asked her

21   again about whether or not this medicine had fetal cells

22   in it when she prescribed it to me.

23   Q.   Okay.  Do you recall when this conversation

24   took place with your medical provider?

25   A.   That didn't happen until after COVID,

82

SELINA KEENE - July 24, 2023

1    seriously.  Because, you know, you didn't believe that

2    this was going to be a problem, but -- yeah.  That

3    happened probably in -- could have been in 2020 going

4    into 2021.  I cannot exactly remember the date.

5           Q.   Okay.  And so I just want make sure I have

6    this right.

7                So you said your doctor told you that she

8    wouldn't prescribe you anything that had fetal cells in

9    it; is that correct?

10          A.   Wait a minute.  Hold on.  Not knowingly.

11          Q.   Not knowingly?

12          A.   Yeah.

13          Q.   What about -- did you -- did you discuss with

14   her whether or not -- so setting aside whether there's

15   actually fetal cells in the medication, which I

16   understand would be incredibly rare, did you discuss

17   with her about fetal cells being use for production or

18   development, as opposed to being physically in the

19   medication?

20          A.   No.  I did not talk to her about that.

21          Q.   What about testing?  Did you ask her whether

22   the medications used fetal cells for -- to test the

23   efficiency of them?

24          A.   No.  I did not have that conversation with

25   her.

SELINA KEENE - July 24, 2023

1          And I said, Really?  That -- that's all
2    I could say.  You know, basically, I said, where is --
3    you know, they never gave me any data.  They just
4    basically said it and I was supposed to believe them,
5    but -- the City says a lot of stuff and it doesn't mean
6    that it's true, so, you know, I didn't know whether or
7    not to believe the City or not.
8          Q.   Did you do any of your own research after
9    receiving that list of medications from the City to see
10   whether or not what they were representing about the use
11   of the fetal cell lines is true?
12         A.   The only one that I was able to get a
13   confirmation on was ibuprofen.  That's the one that I
14   was able to get it, because it's not like -- they've
15   changed the way searches are.  To me, you can't always
16   dig deep into a search and get exactly what -- because
17   I've -- what I'll say is this, This medicine have a --
18   derived from aborted fetal cells.  And it gives you all
19   this other stuff and doesn't give you exactly what you
20   need and so it's kind of hard to get that information.
21         Q.   Did you ask your medical provider if she had
22   that information?
23         A.   No, I did not.
24         Q.   Now, if we look at the bottom of this page,
25   there is some information from the VAERS report.

86

SELINA KEENE - July 24, 2023

1        A.    Uh-huh.

2        Q.    All right.   And in here it has some statistics

3    as of July 3rd, 2021.   And for the BioNTech/Pfizer, it

4    lists 9,868 deaths and 767,225 injuries.

5              Do you see that?

6        A.    Uh-huh.

7        Q.    Were you opposed to -- and then there's

8    similar statistics for Moderna.   Looks like a smaller

9    number of deaths, but still over 5,00 and then over

10   212,000 vaccine injuries.

11             Did you understand this information that's in

12   this letter to be true?

13       A.    Well, these are -- yeah, I -- I -- I

14   understand this information to be true.   It's supposed

15   to be coming from the CDC, because the CDC and FDA have

16   the VAERS report -- the reporting system that either

17   patients who have gotten harmed or doctors who are

18   supposed to report this information to.

19             So I'm sure that this information is outdated

20   and it's probably more injuries and deaths than what it

21   is reported here on this particular letter.

22       Q.    You know, did these numbers of injuries or

23   deaths strike you as being high compared to what you

24   would expect for another type of vaccine, like tetanus

25   or MMR?

SELINA KEENE - July 24, 2023

1        A.    Of course it did, because it's 30 times more
2   than any -- if you go on the VAERS report, which I have,
3   they actually show all the other injuries and deaths,
4   over all -- of all the other vaccines that's come out.
5   And the vaccines for COVID is way worse than the total
6   of all the other ones combined, so -- yeah, this is --
7   it's really bad.
8            Actually, there's supposed to be a safety
9   protocol that they're supposed to recall medications if
10  it goes over five deaths.   It's -- my understanding, if
11  it goes over five deaths, they're supposed to recall the
12  med.   They're not even supposed to keep it going.
13           And these people are so greedy, as far as
14  money is concerned, making money off this thing, they
15  don't care.   So they don't -- look, you got 9,000 --
16  almost 10,000 deaths on Pfizer and you got 5,500 on
17  Moderna.
18           Like I said, this information is outdated, but
19  even five deaths should have stopped the vaccine --
20  their so-called jab, from furthering usage, and it
21  didn't and so that's a major problem.   All of this is a
22  major problem, but nobody is doing anything about it.
23      Q.   And so this major problem, this high number of
24  deaths, a reason why you refused to get the COVID-19
25  vaccine?

                                                              88

SELINA KEENE - July 24, 2023

1          **A.    Like I mentioned in the previous questionnaire**
2   **you asked me about, it's a concern.   And also -- my**
3   **primary is the fact that it had -- it's being used by**
4   **fetal cells -- aborted fetal cells.   That's the primary.**
5   **But this is also a major issue, because it is causing**
6   **deaths and it is causing harm.**
7          **And I already -- like I said before, my**
8   **previous testimony, I already have problems with me,**
9   **that I don't need help from a shot to kill myself, okay,**
10  **or to die.   So -- so -- so being pressured to take**
11  **something that I know ultimately is going to cause me**
12  **harm is a problem.**
13         Q.   Thank you.
14              MS. WOOD:  We can take this exhibit down.
15              (Complied.)
16  BY MS. WOOD:
17         Q.   Now, we took a break a bit earlier, about an
18  hour ago.
19              During the break, did you speak to your
20  attorney?
21         **A.   No, I did not.**
22              MS. WOOD:  Okay.  So let's just go off the
23  record for one moment here.
24              (Off the record at 12:28 p.m. and back
25               on the record at 12:40 p.m.)

                                                          89

SELINA KEENE - July 24, 2023

1    Q.   And then -- all right.  So we'll first look at

2    the e-mail on this first page, here.

3          And in the third full paragraph, you mention

4    the time frame.  And it says, "My understanding

5    attending the Citywide COVID meet and confer table is

6    the exemption accommodation process should be a seven

7    (7) day turnaround."

8    A.   **Right.**

9    Q.   Do you see that?

10   A.   **Yes.**

11   Q.   When you say the "Citywide COVID meet and

12   confer table," could you tell me what it is that you

13   mean by that?

14   **A.   Well, basically by being a shop steward and**

15   **being on the bargaining team, we -- actually, the union**

16   **and the City had met.  And the City is the one that said**

17   **there should be a seven-day turnaround, informing the**

18   **union that -- during this time.**

19         **So that's where I'm getting that from.**

20   Q.   Okay.  And you actually attended the meet and

21   confer on behalf of SEIU --

22   **A.   Yes.  Yes, because I was a bargaining team**

23   **member, yes.  From the previous contract, yes.**

24   Q.   Okay.  Have you filed a grievance with SEIU

25   related to the COVID-19 vaccination policy?

                                                          91

1      A.    Yes.

2      Q.    Do you have an arbitration date set yet for
3   your grievance?

4      A.    No.   It's been back and forth, so I have to
5   get into contact with the union.   A lot of players have
6   changed, too, so that's a major problem.

7      Q.    On.   And through that arbitration, is the
8   relief you're seeking to get your job back?

9      A.    My job back, also address the violation of
10  my -- there are several things going on.   There's
11  getting the job -- well, not getting dismissed from my
12  job, plus the ADA and medical violations that the City
13  did towards me during this whole process is --

14          Again, I was out on disability.   I should have
15  not had to actually deal with this stuff, but I was
16  constantly being bombarded by the City, with my
17  employer, DHS and department of human services in a
18  nonpolicy, illegal manner.   I -- you know, everybody
19  else -- what I've heard is other individuals, across
20  other City departments who had been on disability, have
21  not had to address this until they came back.   I wasn't
22  given that option at all.   I was constantly violated,
23  bombarded every single week, every month.   I couldn't
24  rest.   So that meant my chronic illness that I was
25  dealing with, the stress and the anxiety and the -- the

92

SELINA KEENE - July 24, 2023

1   episodes of my atrial fib continued -- was ongoing.  I
2   couldn't get any rest.  I -- I -- it was just
3   ridiculous, so -- yeah.  All of that is part of the
4   issue.
5       Q.   Is your religious exemption at issue in your
6   grievance?
7       A.   Yes, it is.  It should be in there, yes.
8       Q.   So I know you don't have an arbitration date
9   set.
10      A.   Right.
11      Q.   Once you get one set and then the arbitrator
12  issues the decision, if you would -- if you and the
13  union would prevail, then you would expect to be
14  reinstated to your prior position with backpay?
15      A.   I'm -- I'm -- I'm assuming, yes.  I'm
16  assuming, yes.  Because I have -- like I said, I
17  haven't -- there hasn't been anything set up and I
18  haven't talk to anyone for a minute, so -- again, I'm
19  not sure what's going on.  I'm going to have to give
20  some calls.  Again, like I said, the players have
21  changed and -- so I'm trying to find out what -- what --
22  what -- what -- what the last issue -- or what -- where
23  we stand and what's the updates.  I need to get that.
24      Q.   Okay.  So do you recall approximately when you
25  filed your grievance?

93

SELINA KEENE - July 24, 2023

1        A.    Yeah.   Yeah.   There's several Bible apps
2    that's out there.   The one that I use, I basically use
3    it to give daily prayers and pray every day, so it gives
4    me a different message, a different inspiration and then
5    a different prayer at the end.   And a lot of times, I'll
6    share those with my friends and family, you know.
7    Because a lot of times, depending on what I'm feeling,
8    it will give me something that's totally on point on
9    what I'm currently dealing with, and so -- but -- but it
10   gives me a notification on a daily basis and I read it.
11       Q.    Okay.   Thank you for that.
12             And when you were filling out these
13   responses -- let me back up.
14             Do these responses that you submitted to human
15   resources, do they accurately reflect your beliefs at
16   the time that you sent them in?
17       A.    Yes.
18       Q.    I want to look, first, at Question No. 1,
19   which says to, "Please identify the specific religious
20   tenet that prohibits the COVID-19 vaccination."
21             And there you indicate a Bible verse relating
22   to the body being a temple and God's temple being holy.
23   And then you wrote, "My body is not to be subjected to
24   coercive experiments with clear danger and harm already
25   proven by the CDC/VAERS."

                                                        100

SELINA KEENE - July 24, 2023

```
 1              Do you see that?
 2    A.    Yes.
 3    Q.    Could you very briefly -- let me strike that.
 4          So based on this here, you were telling the
 5    human resources department that you believe that using
 6    the COVID-19 vaccine would be harming your body, which
 7    you feel is God's temple; is that accurate?
 8    A.    That's accurate.
 9    Q.    And there's the clear danger and harm.
10          Is that in line with what we've already
11    discussed about the vaccine injuries and deaths?
12    A.    Yes.  That's a clear danger, yes.
13    Q.    And you call it "coercive experiments."
14          What do you mean by that?
15    A.    What the City was doing to us -- trying to
16    coerce us to take the vaccine in order to keep our job.
17    Q.    And what about the use of the term of
18    "experiment."
19          What did you mean by that?
20    A.    Well, because it's not -- it wasn't actually
21    legally made a vaccine.  So basically an experiment,
22    you're supposed to have Constitutional bodily autonomy
23    in order to make a decision about whether it was right
24    or bad for you.  So you're supposed to be, ultimately,
25    the person that says, Okay, I'm doing that, or, Okay,
```

101

SELINA KEENE - July 24, 2023

1   I'm not going to do that.  You're not supposed to have

2   to go through coercion for an experiment that's not

3   legally made a vaccine.  They bait and switch.  This is

4   gene therapy.

5           So at the end of the day, it was never a

6   vaccine.  Because remember, the only thing that was

7   licensed was the COMIRNATY.  COMIRNATY was never

8   available in the United States.  So at -- everything

9   else, even though it's emergency use, it's still an

10  experiment, because they never had any data behind it,

11  stating whether it would cause harm or not.  Remember, I

12  just mentioned before, that in the commercials they

13  never had the side effects, the normal disclosures,

14  letting people know that this can do X, Y, Z to your

15  body, period.  Never did it.  You still don't see it on

16  COVID commercials.

17          So they're -- they're -- they're promoting

18  something that causes harm -- that clearly causes harm,

19  but -- and then they're not being transparent about it

20  and they're not being held accountable and there's no

21  integrity.  So why would you put something like that in

22  your body?

23      Q.   Okay.  Thank you for that.

24          Let's go down to No. 3.  It says, "Can you

25  provide any existing literature to support your

102

SELINA KEENE - July 24, 2023

1  have to prove my religion to you, how -- what my beliefs

2  are?  No one should have to do that, because no one --

3          Matter of fact, I asked in -- that's the

4  reason why I asked if you had those questions -- which I

5  probably should have also put in as a notification,

6  which I thought did, an e-mail to them about their

7  actual -- what gives them the -- what qualifies them to

8  make a determination about religious -- none of them in

9  the HR or LR office have religious background.  So how

10  would you know how to make a determination about whether

11  to grant somebody a religious accommodation.  No one has

12  it.  Everybody is getting taught.  This is on the fly.

13  No one had -- knew how to deal with this.  No one.

14      Q.    You also mentioned a violation of your bodily

15  autonomy.

16          So you also believe that the vaccine policy

17  was violating your personal autonomy, right?

18      A.    Yes, I did.  Because, first of all, it's my

19  body.  I'm supposed to make that decision.  Not you, not

20  nobody from the City.  No one should be coercing me.  No

21  one should try to tell -- the man -- your supposed to

22  take this just to keep your job.

23          Let me just say.  It was never a requirement

24  for me to be hired with the City and County of

25  San Francisco when I got hired.  This was never an

104

1    issue.  Now, all of a sudden, it's a issue.  Every

2    single person who is trying to get with the City now,

3    they want to ask them these questions.  Why?  That's

4    not -- that's not even legal.  Why they even asking that

5    to get hired for an employment -- for a career.  They

6    shouldn't be doing that.

7         Q.   In your view, do you believe that the City

8    should have granted any and all requests for religious

9    exemption that were made by its employees?

10        A.   Yes, I do.

11        Q.   So going back to the exemption process.  You

12   had said that you believe that all the requests should

13   be granted.

14             So do you believe it was impermissible for the

15   City to ask any follow-up questions when they

16   received the religious exemption request?

17        A.   Where did the exemption questions come from?

18   Who designed these questions?  How -- like I said, what

19   qualifies the individual asking these questions to even

20   receive the answers?  If the answers -- even if the

21   answers are correct, how can you make a determination if

22   you're not qualified to make a determinating.

23             To me, it was a blanket no for mostly

24   everybody who asked to get a request -- to get the

25   religious accommodation request.  And then for an

                                                          105

SELINA KEENE - July 24, 2023

1   that.

2       Q.   I'm not asking -- I'm not trying to imply any

3   of that --

4       A.   All right.

5       Q.   Did you share this response with Ms. Fountila?

6       A.   I don't remember.  I don't remember.

7       Q.   And why did you believe that this question was

8   irrelevant to the matter?

9       A.   Because if -- I mean, the thing is, what does

10  that have to do -- if you're worshiping, you're

11  worshiping.  Whether somebody has a belief about COVID

12  or don't have a belief about COVID, it shouldn't matter.

13  We are all worshiping the same -- same God.  So to me,

14  that didn't make any sense.

15      Q.   Okay.  I want to go down to Question No. 7.

16  And this one asks, "Please identify the specific

17  religious tenet, practice or observation used to

18  identify substances that are harmful and state how you

19  applied this to the COVID-19 vaccine."

20           And first you note that you're an evangelical

21  Christian who believes in the Bible as the Word of God

22  and that loving God and neighbor means do no harm.

23           And then you wrote here, "My religious

24  objections to CV-19 mRNA and adenovirus vector vaccines,

25  the COVID-19 vaccines, is because they do not operate

107

SELINA KEENE - July 24, 2023

1    the same as traditional vaccines.  Instead of fragment

2    dead virus and an adjuvant to induce immune response,

3    they use genetic coding to instruct the body to produce

4    a spike protein that is not natural to your own human

5    genetic system."

6           Where did you get this information from for

7    this response, here?

8       A.   I know I got it from -- no.  I don't know,

9    exactly.  Let me just rephrase that.  Strike that.

10          Let me just say that I can't remember exactly

11   where I got that from, but it was -- it was appropriate

12   and that's why I used it.  It could have been some -- a

13   resource that I read or something like that.  I can --

14   can't, off the top, remember exactly where I got that

15   from.

16      Q.   So one of the objections that you had to the

17   vaccine was that you believe that the spike protein in

18   it would alter your DNA or your genetic material --

19      A.   Yes.  That was some of the information I got

20   from alternative sources as well.

21      Q.   And would those be, like, news sources, like,

22   scientists, doctors that you mentioned before?

23      A.   Right, right.

24      Q.   I want to go to the next page to Question

25   No. 10.  So Question No. 10 asks, Have you ever taken

                                                        108

SELINA KEENE - July 24, 2023

1    A.   I have one.

2    Q.   How old is your child?

3    **A.   She is now -- she's 38.**

4    Q.   Did you have her vaccinated as a child?

5    **A.   That was a requirement at the time.  I don't**

6    **know if I did all of her vaccinations.  But that was a**

7    **recommendation from the pediatric doctor.  And at that**

8    **time, I trusted the pediatric doctor.  I was a young**

9    **mother.  I was in my early twenties, so I had not done a**

10   **whole lot of research on vaccinations, then.  No one was**

11   **doing that.  People were just following doctor**

12   **recommendations.**

13   Q.   I want to scroll down to Question No. 13.

14        So we've -- you've alluded to this question

15   earlier in your testimony.

16   **A.   Right.**

17   Q.   This was -- you had mentioned that there was a

18   question that indicated that many common medications

19   were developed using the same type of fetal cell line

20   technology as the COVID-19 vaccine.

21        Is this what you were thinking of when you

22   were testifying about that list?

23   **A.   Yes.**

24   Q.   And then in your response, you wrote, "I do

25   not utilize many of the medicines mentioned, but I have

110

SELINA KEENE - July 24, 2023

1    always had the choice of whether or not to take them.

2    They have never been forced on me or affected my

3    livelihood."

4        A.    Uh-huh.

5        Q.    First I want to ask you, which of these

6    medications have you taken in the past, and we can just

7    go through in order.

8              The first one is Tylenol.

9              Is that something you've taken in the past?

10       A.    Yes.  I have taken that in the past.

11       Q.    When do you recall -- do you still take

12   Tylenol?

13       A.    No, not really.  Actually, I don't really have

14   headaches and stuff like that like I used to back in the

15   day, but -- yeah.

16             I actually -- I bought it for a family member

17   or whatnot for a fever, because that's generally what

18   it's used for.  Never for pain, so --

19             But like I said, on the list, that you guys

20   have here, no one knew about that.  I mean, no one was

21   thinking about -- about the fetal cell line for vaccines

22   or any other medications prior to this.  No one even

23   really realized that that was being done with meds --

24   with drugs, in general, so -- and then there was no --

25             There's a statement being made in this

111

SELINA KEENE - July 24, 2023

1   question, but there was no data or backup or any kind of
2   cliff note, footnote, whatever to explain, Okay, this is
3   where you can get it from to prove that this -- these
4   are meds that we're talking about.  It was just thrown
5   out to us, as far as a question.
6        Q.   So you mentioned that you purchased Tylenol
7   for a family member who had a fever.
8             When did you purchase Tylenol the last time?
9        A.   Shoot.  That's probably, like, almost a year
10  ago, six months.  I'm saying it because it's in this
11  period of time.
12       Q.   Okay.  So you purchased that.
13            And since the fall of 2021, have you
14  personally taken Tylenol?
15       A.   No.
16       Q.   But you did buy Tylenol for a family member?
17       A.   I did.
18       Q.   And when purchasing it, did you have any
19  concerns that you might be purchasing a product that had
20  used fetal cell lines in its development?
21       A.   You know what -- let me just also say.  I
22  forgot about everything in this list that was mentioned.
23  Because, again, that wasn't something that was
24  disclosed, like -- you know, if it's a commercial that's
25  out, like Tylenol, it didn't say, Oh, it's made from --

                                                        112

SELINA KEENE - July 24, 2023

1    or derived from fetal cells.  They don't say that, so I
2    just -- I definitely wasn't thinking about that.
3        Q.    But if Tylenol is, in fact, developed using
4    fetal cell lines, would it violate your religious
5    beliefs for you to purchase that Tylenol?
6        A.    Yes, it would.
7             MR. DAVIS:  Calls for speculation.
8    BY MS. WOOD:
9        Q.    Okay.  Have you taken Pepto Bismol?
10       A.    No.
11       Q.    Aspirin?
12       A.    Baby aspirin, years ago.
13       Q.    Have you taken it at any time in the last two
14   years?
15       A.    No.
16       Q.    What about Tums?  Is that something you've
17   taken before?
18       A.    I have taken Tums before.
19       Q.    When is the last time you took Tums?
20       A.    I took -- I'm just going to be honest.  I took
21   Tums maybe three months ago.
22       Q.    And did you have any concerns about --
23       A.    I did.  I did.  And at the time I took it for
24   it, it didn't help me anyway, so...
25       Q.    So you had concerns.  What were those

113

SELINA KEENE - July 24, 2023

1   concerns?

2       A.   It was just -- it's just the general concern

3   of taking something that I know I didn't have no

4   business taking, because I don't believe in with -- how

5   it was derived and -- but I was suffering, you know.  My

6   body was in crisis and I needed to made sure I tried to

7   take something.

8       Because other than that, I just tried to --

9   generally, what I do -- because I have acid reflux and

10  so -- and, generally, what I will do is take -- drink

11  ginger ale to try to settle it and so -- yeah.  But that

12  was -- like I said, that was about three months ago.

13     Q.   So help me understand this.  Why is it that

14  you cannot take the COVID-19 vaccine because of its

15  relationship to the use of fetal cell lines, but it was

16  okay for you to take Tums three months ago?

17       MR. DAVIS:  Assumes facts not in evidence.

18  BY MS. WOOD:

19     Q.   You can go ahead and answer.

20     A.   So this was because I -- at that time, I was

21  having discomfort and no -- after I took it, I thought

22  about it, but I had already taken it, so it was too late

23  by then, so...

24     Q.   If the COVID-19 vaccines -- I understand that

25  you don't believe that they are vaccines, but if they

114

SELINA KEENE - July 24, 2023

1      A.   No.

2      Q.   Claritin?

3      A.   No.

4      Q.   Zoloft?

5      A.   No.

6      Q.   Prilosec OTC?

7      A.   No.

8      Q.   Azithromycin?

9      A.   No.

10     Q.   I believe that's an antibiotic.

11     A.   Right.

12     Q.   And in your response, you said, "I see a clear

13  difference between helping a body in crisis and

14  addressing a heathy body with medical help or

15  intervention.  If my body were in crisis, I would

16  consider all the options and discuss what to do with my

17  trusted physician/healer while praying for God's help,

18  guidance and healing for longevity to my life."

19        Can you explain to me what you mean by that

20  response there?

21     A.   Well, let me just say that pharmaceutical

22  medicine is not the only way to help heal you.  And

23  there are -- I've always asked my physician about more

24  natural ways to help with any of my ailments.  She knows

25  that I do not like taking meds, period, but I'm only

                                                        117

SELINA KEENE - July 24, 2023

1    taking them right now, for the time being, until I can

2    find alternative methods.  So -- but she has referred me

3    to different places, in order for me to take meds -- I

4    mean, not take meds and to do a more natural course,

5    so -- and she knows I don't like taking medicine.  She

6    knows that.  And so I've been going back and forth with

7    her for about, you know -- anywhere from 10, 12 years or

8    so to do something different.

9        Q.   What I was kind of more wanting to understand

10   is, do you see there's a difference in terms of -- if

11   medication was developed using fetal cell lines, do you

12   think there's a difference if that medication is being

13   offered in a situation where it's going to potentially

14   save the person's life or there in acute distress,

15   versus the COVID-19 vaccination, which is something

16   that's given prophylactically; it's to prevent illness.

17            Do you see a difference in those two?

18            MR. DAVIS:  Objection.  Calls for speculation.

19            THE WITNESS:  I do see a difference.  The

20   difference to me is where it's derived from.

21            You know, the bottom line is this so-called

22   vaccine didn't prevent anything.  People still caught

23   COVID-19, started spreading COVID, transmitted COVID.

24   So it -- like I said, I have documentation, many, many

25   e-mails of November 1st -- the first week of November

118

SELINA KEENE - July 24, 2023

1   when people stepped down that were not vaccinated.

2         The problem with the City and County, compared

3   to the State, they gave the option of testing.  I could

4   have simply been tested.  The City -- the mayor, she

5   decided to be a bully.  Everybody needs to be

6   vaccinated.  No, everybody doesn't need to be

7   vaccinated, because the vaccination doesn't work.  The

8   COVID shot does not work.

9         It's -- if -- initially, they said that it

10   would prevent you from getting COVID.  That's what they

11   said out the gate.  Then they twisted it up, you know,

12   bait and switched it and said, No, it's not going to

13   prevent -- it will stop you from being in the hospital

14   or stop you from dying, but that was a lie.  So the

15   whole thing has been a lie.  So at the end of the day,

16   would -- what's the agenda?  Who's benefiting from this?

17   No one.

18   BY MS. WOOD:

19      Q.   Okay.  So as I'm understanding you, it sounds

20   like one of the big issues that might differentiate the

21   COVID-19 vaccination that used fetal cell lines in

22   production and other medications that are effective, but

23   that also were developed using fetal cells lines, is

24   that, on the one end, certain medications are effective.

25   On the other hand, in your view, the COVID-19

119

SELINA KEENE - July 24, 2023

1    vaccination is completely ineffective.

2            Is that the key difference?

3        A.    No, no, no, I'm not saying that.   At the end

4    of the day, really none of them are effective to really

5    treat anything -- or let's say -- what I'm saying is to

6    cure what's wrong with somebody.   So, basically, this is

7    supposed to help somebody along, who is suffering.   But

8    when -- the difference between the two is one is a

9    choice.   The other was not.   And if you have a choice

10   and you know that -- okay, this is something that you

11   don't agree with, then you have a choice not to take it.

12           Yeah, I slipped and I took some Tums, three

13   months ago.   I took a Tum.   Let me correct that.   I took

14   a Tum, okay?   I should not be held at -- for a mistake

15   that really didn't help me for this purpose.

16           The purpose I'm saying is that it was a choice

17   that I decided to do that.   When this particular

18   situation was put upon me, it was never a choice.   It

19   was pushed me on.   It was forced on me.   I was coerced.

20           But it -- at the end of the day, the COVID,

21   so-called vaccines, never helped anybody.   Even though

22   they claimed, Oh, it will keep you out of the hospital,

23   it will keep you from having really major issues.   That

24   whole situation was a lie, so -- you know, you're

25   talking about something that's -- that has clear data,

120

SELINA KEENE - July 24, 2023

1   that has clear -- that's a clear falsehood that you're

2   trying to push on people, in comparison to something

3   that's been out for years.   And, unfortunately, didn't

4   disclose that it also may have had fetal cell -- and how

5   it was created.   I don't know that for sure.   You're

6   saying that.

7            I still don't know that these meds that you

8   have on the side -- that the City has on the side of

9   this questionnaire actually derived -- there's no data

10  even proving that.   So I'm just taking it from your

11  mouth to my -- or to my ears.   I don't know for sure if

12  that's even the truth, so --

13           You know, to try to put me -- guilt trip me,

14  that's not going to help me.   What I need is to get my

15  profession back, my passion back, my career back, in

16  order for me to make sure that other people are okay and

17  to support others in the community.   That's what I want

18  back.

19       Q.   I believe you just called taking Tums, three

20  months ago, a mistake.

21           Why do you believe it was a mistake to take

22  Tums?

23       A.   Because, at the time, I wasn't thinking.   I

24  think I was just thinking about my -- my -- you know, my

25  discomfort at the time.   But like I said, it didn't even

SELINA KEENE - July 24, 2023

1   help me.  And so me drinking some ginger ale actually

2   did.  And so -- you know, unfortunately, there it is.

3   But like I said, I'm not -- you know, all I can do is

4   forgive myself.

5           In reality, I wouldn't just be popping drugs

6   that -- if I'd known, I, generally, wouldn't be popping

7   drugs that I know derive from fetal cells.  Because, you

8   know, to create murder in order achieve a goal, is --

9   is -- is really a problem and it is a sin.

10          You know, at the end of the day, they have to

11  find other methods in order to create the things that

12  they're trying to create to supposedly help people,

13  so...

14      Q.   Okay.  Thank you for that response.  I'm not

15  sure if I got -- if you answered quite precisely the

16  question that I asked.  Maybe I'll ask a more narrow

17  question.

18          Did you believe it was a mistake to take Tums

19  because you understood that it may have used fetal cell

20  lines in its development?

21      A.   Yes.

22      Q.   Thank you for that.

23          MS. WOOD:  We can take down this exhibit.

24          (Complied.)

25  ///

                                                    122

SELINA KEENE - July 24, 2023

1          CERTIFICATE OF DEPOSITION OFFICER

2

3          I, ANGIE M. MATERAZZI, CSR No. 13116, duly

4    authorized to administer oaths Pursuant to Section

5    2093(b) of the California Code of Civil Procedure,

6    hereby certify that the witness in the foregoing

7    deposition was by me duly sworn to testify to the truth,

8    the whole truth and nothing but the truth in the

9    within-entitled cause; that said deposition was taken at

10   the time and place therein stated; that the testimony of

11   the said witness was reported by me remotely and

12   thereafter transcribed by me or under my direction into

13   typewriting; that the foregoing is a full, complete and

14   true record of said testimony; and that the witness was

15   given an opportunity to read and correct said deposition

16   and to subscribe the same.

17          I further certify that I am not of counsel nor

18   attorney for either or any of the parties in the

19   deposition and caption named, or in any way interested

20   in the outcome of the cause named in said caption.

21          I hereby certify this copy is a true and
     exact copy of the original.
22

23   Date: July 31, 2023

24   _____

25          ANGIE M. MATERAZZI, CSR 13116

                                                     125