MICHAEL BRUNO (SBN: 166805)
ALYSON CABRERA (SBN: 222717)
MANA KOLEINI (SBN: 304381)
PAMELA NG (SBN: 273036)
GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111
Telephone: (415) 986-5900
Facsimile: (415) 986-8054
mbruno@grsm.com
acabrera@grsm.com
mkoleini@grsm.com
png@grsm.com

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THADDEUS SALEEN SHAHEED, JESSE MURILLO, RICARDO TREJO, and PHILIPPE J, CABRAL,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO; DOES 1-100,<br><br>Defendants. | CASE NO.: 22-cv-06013-JSW<br><br>**DEFENDANT CITY AND COUNTY OF SAN FRANCISCO'S OPPOSITION TO PLAINTIFF THADDEUS SALEEN SHAHEED'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: November 21, 2025<br>Time: 9:00 AM<br>Judge: The Honorable Jeffrey S. White |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...........................................................................................................1

II. STATEMENT OF FACTS ..............................................................................................1

   A. PLAINTIFF'S EMPLOYMENT AND PERFORMANCE ISSUES.....................1

      1. Plaintiff's Essential Job Duties Included Engaging in Courteous and Professional Communications ...................................................................1

      2. Plaintiff's Performance Declines in 2018 Without Improvement .............2

   B. THE CITY ENGAGES IN THE INTERACTIVE PROCESS FOR PLAINTIFF'S RELIGIOUS EXEMPTION REQUEST, BUT COULD NOT ACCOMMODATE HIM WITHOUT UNDUE HARDSHIP. .............................4

   C. PLAINTIFF SIGNIFICANTLY DELAYED SEEKING A PRELIMINARY INJUNCTION ...........................................................................................................6

III. ARGUMENT ...................................................................................................................6

   A. PLAINTIFF'S DELAY IN SEEKING PRELIMINARY INJUNCTIVE RELIEF WEIGHS DETERMINATIVELY AGAINST HIS ARGUMENT REGARDING IRREPARABLE HARM ...........................................................................................6

   B. PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM .............7

   C. PLAINTIFF HAS NOT DEMONSTRATED HE IS LIKELY TO PREVAIL ON THE MERITS ...........................................................................................................9

   D. THE BALANCE OF EQUITIES AND PUBLIC INTEREST ALSO WEIGH AGAINST A PRELIMINARY INJUNCTION. ..................................................12

IV. CONCLUSION..............................................................................................................12

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ..................................................................................................12

*Bolden-Hardge v. Off. of California State Controller*,
63 F.4th 1215 (9th Cir. 2023) ...................................................................................................10

*Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*,
840 F.2d 701 (9th Cir. 1988) .....................................................................................................9

*EEOC v. BNSF Ry. Co.*,
902 F.3d 916 (9th Cir. 2018) .....................................................................................................9

*Farris v. Rice*,
453 F.Supp.2d 76 (D.D.C. 2006) ...............................................................................................8

*Groff v. DeJoy*,
600 U.S. 447 (2023) .................................................................................................................10

*Johnson v. Brown*,
567 F.Supp.3d 1230 (D. Or. 2021) ............................................................................................7

*Keene v. City & Cty. of S.F.*,
No. 24-1574, 2025 WL 341831 (9th Cir. Jan. 30, 2025) ...........................................................8

*Lydo Enterprises, Inc. v. City of Las Vegas*,
745 F.2d 1211 (9th Cir. 1984) ...................................................................................................7

*MacDonald v. Oregon Health & Science University*,
2024 WL 3316199 (D.Or., July 5, 2024) .................................................................................11

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................................................12

*Norris v. Stanley*,
558 F.Supp.3d 556 (W.D. Mich. Aug. 31, 2021) ......................................................................8

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*,
305 F.3d 566 (6th Cir. 2002) .....................................................................................................8

*Peterson v. Hewlett-Packard Co.*,
358 F.3d 599 (9th Cir. 2004) .....................................................................................................9

*Reno-Sparks Indian Colony v. Haaland*,
663 F.Supp.3d 1188 (D. Nev. 2023) ..........................................................................................7

*Sampson v. Murray*,
    415 U.S. 61 (1974) ............................................................................................................ 7, 8

*Univ. of Haw. Pro. Assembly v. Cayetano*,
    183 F.3d 1096 (9th Cir. 1999) ............................................................................................ 12

*Valdez v. Grisham*,
    559 F.Supp.3d 1161 (D.N.M. Sept. 13, 2021) ...................................................................... 8

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................................... 6, 12

**Other Authorities**

Grounds for Granting or Denying a Preliminary Injunction—Irreparable Harm,
    11A Fed. Prac. & Proc. Civ. § 2948.1 § 2948.1 (3d ed.) ...................................................... 6

## I. INTRODUCTION

In response to a global pandemic that killed millions, the City and County of San Francisco ("the City") implemented science-based protective measures, including a vaccination policy, to protect its employees and the public at large. Plaintiff Thaddeus Shaheed requested a religious exemption from the City's vaccination policy, which was denied based on direct threat and undue hardship. Now, three years after Plaintiff left City employment, he belatedly seeks a preliminary injunction to enjoin a separation that has already occurred, for which the status quo does not cause irreparable harm, and for which there is an adequate remedy at law in the form of monetary damages.

The motion should be denied. First, Plaintiff's three-year delay in seeking a preliminary injunction precludes him from seeking one now and conclusively weighs against a finding of undue hardship. Second, Plaintiff cannot meet his burden of showing likelihood of success on the merits. It would have been an undue hardship to grant Plaintiff's religious exemption request due to the nature of his work, and because Plaintiff's documented performance issues – which included yelling at members of the public and sleeping on the job – made it nearly impossible for the City to allow Plaintiff to continue to work from home.

## II. STATEMENT OF FACTS

### A. PLAINTIFF'S EMPLOYMENT AND PERFORMANCE ISSUES

#### 1. Plaintiff's Essential Job Duties Included Engaging in Courteous and Professional Communications

Plaintiff worked as a 1324 Customer Service Agent ("CSA") for the City in the 311 Call Center. Declaration of Kevin Dyer ["Dyer Dec."] at ¶ 4. The 311 Call Center provides prompt, courteous, and professional customer service 24 hours a day, 7 days a week to San Francisco residents, visitors, and businesses seeking general information, enabling the government to be transparent, responsive, effective, and efficient. Dyer Dec. at ¶ 1. As a CSA, Plaintiff's job duties included receiving and processing telephone calls from the public "requesting government services and information in a professional and courteous manner"; "identifying the type of service requested by listening, asking relevant questions, [and]

-1-

DEFENDANT'S OPPOSITION TO PLAINTIFF THADDEUS SALEEN SHAHEED'S
MOTION FOR PRELIMINARY INJUNCTION; CASE NO.: 22-cv-06013-JSW

evaluating the information obtained" to successfully handle the request; and "referring callers to appropriate and available City Services." Exhibit 1 to Dyer Dec. at ¶ 4. Plaintiff operated a multi-screen computer terminal, keyboard, mouse, phone, and headset to field the telephone calls. *Id.*

In the 311 Call Center office, CSAs work in "pods," wherein up to 12 CSAs sit around a supervisor, who would listen to the CSA's calls, provide guidance to CSAs, and help triage any difficult calls as needed to maintain a high level of quality interactions with the public. Dyer Dec. at ¶ 5. Prior to the pandemic, five to seventy employees would be in the 311 Call Center Office at any given shift. *Id.* Essential qualifications for the job include the ability to "deal courteously, effectively and tactfully with the general public and others . . .; effectively work under pressure including calmly and effectively dealing with escalating or difficult calls; ask appropriate questions to identify complex requests for City services and information; identify calls which must be referred to 911 or to trainer/supervisor; . . . speak with a pleasant and clear voice; work harmoniously and cooperatively with departmental staff and callers from a variety of cultural and socioeconomic backgrounds; . . . and be attentive to, and accurately record details of calls and referrals." Exhibit 1 to Dyer Dec. at ¶ 4. To enable supervisors to monitor and support CSAs to maintain a high level of professional service to the public, CSAs must be able to work in-person in the Call Center office either full-time or up to one day per week with an approved telecommute agreement that is available to CSAs with satisfactory performance and attendance. Dyer Dec. at ¶ 6. Further, in-person attendance was necessary to conduct trainings or handle any necessary technical or equipment issues. *Id.*

### 2. Plaintiff's Performance Declines in 2018 Without Improvement

In or around 2018, Plaintiff's performance began to decline to the point where after multiple coaching sessions and a verbal warning, the City suspended him in March 2019 for one day for failing to perform his duties. Dyer Dec. at ¶ 7. The suspension stemmed from an incident in which he disrespected and used a swear word toward a City employee; and another incident in which he made disparaging remarks concerning a public caller's perceived socioeconomic status and engaged in an inappropriate back and forth with the caller. *Id.*

Even after this suspension, Plaintiff's performance issues continued. In June 2020, the City issued a 15-day suspension for incidents in 2019 consisting of unprofessional and discourteous conduct toward other City employees, his supervisor, and members of the public; misuse of City time; inattention to his duties, including sleeping at his workstation; failure to perform his job duties, such refusing to note details relayed by a caller; dishonesty during an investigatory interview; conduct unbecoming of a City employee; insubordination for ignoring his supervisor's request to meet; and violations of 311 Office guidelines.[1] Dyer Dec. at ¶ 8.

Early in the COVID-19 pandemic, the City issued the Interim COVID-19 Telecommute Policy due to the COVID-19 pandemic which allowed employees who could to work from home on a temporary basis. Request for Judicial Notice ["RJN"], Ex. A. The purpose was to "limit the number of employees physically present on site . . . in order to promote the health and safety of City workers" during the pandemic. *Id.* Almost all CSAs, including Plaintiff, worked from home full-time on a temporary basis. Dyer Dec. ¶ 9. Some CSAs still worked in-person, but the number was low enough where they were able to socially distance at their workstations and stagger their use of common areas, such as the breakroom, to avoid more than one person in the vicinity. *Id.* Because of the lack of contemporaneous monitoring of calls, a supervisor's ability to provide on the spot guidance, and regular training during this period, the quality of interactions was not as high as they were when CSAs worked in the office. Dyer Dec. ¶ 10. Plaintiff's performance, in particular, continued to suffer – at one point he received seven complaints from the public over the course of five months. *Id.* Plaintiff's continued performance issues were similar to those that warranted his suspensions, including Plaintiff talking over callers, being combative or confrontational, hanging up on callers (sometimes multiple times), giving them the wrong information, and sleeping for three hours during his work shift. *Id.* Plaintiff's performance issues vastly outnumbered those of other CSAs working at home. *Id.*

---

[1] The parties eventually agreed to reduce the suspension to nine days and removal of the dishonesty charge in March 2021. Dyer Dec. at ¶ 8.

-3-

**B.     THE CITY ENGAGES IN THE INTERACTIVE PROCESS FOR PLAINTIFF'S RELIGIOUS EXEMPTION REQUEST, BUT COULD NOT ACCOMMODATE HIM WITHOUT UNDUE HARDSHIP.**

In response to the COVID-19 pandemic, the City issued its Vaccination Policy on June 18, 2021, which was amended multiple times before the policy ended on August 23, 2023. See RJN Ex. B. The City's Vaccination Policy sought to "provide a safe and healthy workplace, consistent with COVID-19 public health guidance and legal requirements," and "to protect its employees and the public as [the City] reopens services and returns more employees to workplaces." *Id.* at p. 1. Consistent with public health guidance from the CDC, FDA, CDPH and the San Francisco County Health Officer, the City generally required employees to be vaccinated against COVID-19 as a minimum qualification of employment. *Id.* at pp. 4-5. Employees with a medical restriction or a sincerely held religious belief that prohibited them from receiving a vaccine had the opportunity to request a reasonable accommodation to be excused from the vaccination requirement. *Ibid.* Employees who failed to comply with the Vaccination Policy may have faced disciplinary action or non-disciplinary separation from employment for failure to meet the minimum qualifications for City employment. *Ibid.*

On September 28, 2021, Plaintiff requested a religious exemption from the City's vaccine mandate. Declaration of Svetlana Vaksberg ["Vaksberg Dec."] at ¶ 4. The City found that Plaintiff had a sincerely held religious belief that conflicted with its vaccine mandate and engaged in the interactive process to determine whether there was a reasonable accommodation to Plaintiff's unvaccinated status. *Id.* The City explored whether masking, weekly testing, and social distancing would be feasible. *Id.* The department's Employee and Labor Relations division spoke with Plaintiff's supervisor Kevin Dyer concerning possible accommodations for Plaintiff, including masking and weekly testing, social distancing, and telecommuting. Dyer Dec. ¶ 11. The City decided that it could not allow Plaintiff to report to the 311 Call Center office unvaccinated. *See* Declaration of Fiona Wilson ["Wilson Dec."] at ¶ 9. Doing so would have posed a health and safety risk to Plaintiff's co-workers. *Id.* Because he was unvaccinated, Plaintiff was more likely to contract COVID-19 and spread the disease to his co-workers. *Id.* Masking and social distancing, though helpful, would have been insufficient to offset the risk

that Plaintiff posed because of evidence at the time that they were not as effective in minimizing the spread of COVID-19 as vaccines. Wilson Dec. at ¶ 10.

Further it was difficult to monitor mask wearing at all times, and wearing a mask inhibited clear communication during calls (members of the public sometimes expressed difficulty understanding mask-wearing CSAs) and lowered the quality of service to the public. Dyer Dec. at ¶ 11. While it may have been possible to isolate Plaintiff's workstation on a temporary basis, Plaintiff would not have been able to isolate from common areas, such as hallways and the break room, especially after the City ended its Interim COVID-19 Telecommute Policy and required employees to return to work on March 7, 2022. *Id.*

The City also conducted two separate 60-day job search at the department and City-wide level for positions that could accommodate his unvaccinated status. Vaksberg Dec. at ¶ 5. However, the City could not find a comparable position within Plaintiff's qualifications that could accommodate his unvaccinated status. *Id.*

The City also considered Plaintiff's request to continue telecommuting full-time (as Plaintiff did not want to come into the office). While Plaintiff continued to work from home during the interactive process, his ongoing performance issues would have disqualified him from telecommuting full-time, because he was not fulfilling his essential job functions while working from home. Dyer Dec. at ¶ 12. Telecommuting is a privilege available only to employees who have satisfactory job performance and attendance. *Id.* Around the time that the City required employees to return to work, Mr. Shaheed had neither, as seen by the number of complaints from the general public and the discovery that he had slept for three hours during his shift. *Id.* Plaintiff needed close, contemporaneous monitoring by a supervisor to correct issues as they happened and support Plaintiff in performing the essential functions of his position. *See id.* Being in the office would allow the supervisor to make sure Plaintiff was having professional and courteous communications with callers and coworkers, providing accurate information to the public, and not sleeping during his work shift. Further, Plaintiff's Department had plans to resume required in-person trainings and supervision, which had been postponed during the pandemic. Dyer Dec. at ¶ 12.

-5-
DEFENDANT'S OPPOSITION TO PLAINTIFF THADDEUS SALEEN SHAHEED'S
MOTION FOR PRELIMINARY INJUNCTION; CASE NO.: 22-cv-06013-JSW

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Ultimately, the City determined that it could not reasonably accommodate Plaintiff because "accommodation would pose a direct threat to the health and safety of others," "accommodation would prevent employee from performing essential job functions," and "accommodation would result in undue hardship for the City." Dkt # 1-1 at p. 28 (Case 3:22-cv-06013 *consolidated with* 4:22-cv-01587 on March 13, 2023). The City terminated Plaintiff's employment non-punitively, meaning he was free to apply to other City positions. Vaksberg Dec. at ¶ 6. Since his termination to the date of this filing, Plaintiff has not applied to any positions at the department. *Id.*

### C. PLAINTIFF SIGNIFICANTLY DELAYED SEEKING A PRELIMINARY INJUNCTION

Plaintiff's Complaint asserts causes of action for failure to provide a religious accommodation in violation of Title VII and FEHA, as well as a First Amendment violation. Dkt # 1 (Case 3:22-cv-06013). His employment from the City was terminated on or around April 1, 2022, and he filed his Complaint on October 12, 2022. *Id*; *see also* Declaration of Thaddeus Saleem Shaheed in support of Motion for Preliminary Injunction ("Shaheed Decl.") at ¶ 1. **<u>Plaintiff waited over three years to file this Motion for Preliminary Injunction.</u>** Plaintiff claims he was able to find only a temporary part-time position in 2024, but otherwise has not found employment since April 2, 2022, and that he has been struggling financially. Shaheed Decl. at ¶¶ 20, 22. Despite his purported lack of income and financial difficulties for the past three years, Plaintiff suddenly claims he is facing irreparable harm.

### III. ARGUMENT

#### A. PLAINTIFF'S DELAY IN SEEKING PRELIMINARY INJUNCTIVE RELIEF WEIGHS DETERMINATIVELY AGAINST HIS ARGUMENT REGARDING IRREPARABLE HARM

A plaintiff seeking preliminary relief must demonstrate that irreparable injury is likely in the absence of an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also* § 2948.1 Grounds for Granting or Denying a Preliminary Injunction—Irreparable Harm, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) (applicant must demonstrate that in the absence of a preliminary injunction, "the applicant is likely to suffer irreparable harm before a

decision on the merits can be rendered"). A delay in seeking preliminary injunctive relief weighs determinatively against a finding of irreparable harm. *Reno-Sparks Indian Colony v. Haaland*, 663 F. Supp. 3d 1188, 1201 (D. Nev. 2023). "By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action[.]" *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984).

Here, Plaintiff does not mention, much less attempt to explain, his three-year delay in filing a Motion for Preliminary Injunction. He has been aware of his financial status for years and was aware of his mortgage lender beginning the process of foreclosing his home as of June 18, 2025. Shaheed Decl. at ¶¶ 20, 22. It strains credulity that Plaintiff was not aware he was behind on his mortgage payments or that his mortgage lender gave no notice or warning about potential foreclosure prior to June 2025. Although Plaintiff must have known or foreseen his financial difficulties, Plaintiff apparently chose to homeschool his son[2] rather than find new employment.[3] Plaintiff's substantial delay shows there is no apparent urgency to the request for injunctive relief and demonstrates that the status quo does not cause irreparable harm.

### B.   PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM

It is black letter law that money damages ordinarily provide an appropriate remedy for unlawful termination of employment. The Supreme Court has held that "insufficiency of savings or difficulties in immediately obtaining other employment – external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself – will not support a finding of irreparable injury, however severely they may affect a particular individual." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). In *Johnson v. Brown*, 567 F. Supp. 3d 1230, 1265 (D. Or. 2021), a similar Covid vaccine case, the court held that loss of employment does not constitute irreparable harm as it is compensable by money damages. *See*

---

[2] Plaintiff's claim that his son's "school shut down in person classes in late 2019 due to the pandemic" also seems dubious, when the first case of COVID-19 did not reach the United States until mid-January 2020 and California public schools did not close until mid-March 2020. RJN, Exs. C, D. It also seems odd that his son's school remained closed until 2025, two years after California ended the COVID-19 state of emergency. RJN, Ex. E.

[3] Plaintiff claims without explanation that homeschooling made it "nearly impossible to find adequate employment," but that begs the question of how Plaintiff actually would have worked in a new position given the claimed difficulties.

-7-

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

*also, Valdez v. Grisham*, 559 F. Supp. 3d 1161, 1182 (D.N.M. Sept. 13, 2021) (concluding that "being so terminated/prevented from working as a nurse does not equate to irreparable harm" and "Plaintiffs have failed to establish that any loss to Valdez resulting from the [vaccine order] is not compensable by monetary damages"); *Norris v. Stanley*, 558 F.Supp.3d 556, 560 (W.D. Mich. Aug. 31, 2021) ("And if this Court determines during litigation that Plaintiff was wrongfully terminated, Plaintiff would indeed have proper monetary compensation: her lost wages and benefits she did not receive during her period of wrongful termination. These lost wages and benefits can be calculated to an exact amount and are not speculative enough to warrant a temporary restraining order. Therefore, Plaintiff has failed to show that she faces an irreparable injury in the event that MSU terminates Plaintiff's employment [because of a vaccine order]."); *see generally Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002) ("[T]he loss of a job is quintessentially reparable by money damages." (quoting *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995)); *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006) ("[G]iven the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury.").

Plaintiff cites to *Keene v. City & Cty. of S.F.*, No. 24-1574, 2025 WL 341831 (9th Cir. Jan. 30, 2025), an unpublished opinion in which the Ninth Circuit found irreparable harm because the plaintiffs met the exception to the above rule articulated by the Supreme Court: the "circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Sampson v. Murray*, 415 U.S. 61, 92 (1974). In *Keene*, the Ninth Circuit found the unique circumstances and resultant effect around the appellants' termination, wherein the appellants described being "distraught" and "depressed" due to the alleged stigma of losing their decades-long careers and having their religious beliefs deemed "insufficient" was a "dignitary affront," constituted irreparable harm  (*Keene, supra,* at 3). Courts have found irreparable injury concerning similar severe non-monetary harms, such as "emotional and psychological" harms, associated with termination. *See, e.g., Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701,

-8-

DEFENDANT'S OPPOSITION TO PLAINTIFF THADDEUS SALEEN SHAHEED'S
MOTION FOR PRELIMINARY INJUNCTION; CASE NO.: 22-cv-06013-JSW

709, 710 (9th Cir. 1988) (finding irreparable injury when the defendant school district reassigned a HIV-positive teacher who found "tremendous personal satisfaction and joy" teaching hearing-impaired children with specialized skills to a position that involved no student contact and did not utilize his special skills.); *EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 928–29 (9th Cir. 2018) (finding irreparable "dignitary harm of being falsely told that their disability . . . rendered them unfit for work.")

Here, Plaintiff is not entitled to injunctive relief. His claims are typical of those rejected time-and-again by courts considering COVID-19 vaccine mandates, or loss of employment generally, and finding that loss of one's job does not cause irreparable harm as the employee can be compensated through money damages after a finding on the merits. Nothing in Plaintiff's Motion or accompanying Declaration discusses emotional or psychological harms, or any circumstances that depart from the normal termination situation so as to support a finding of irreparable injury. Nor does Plaintiff allege he has been denied the opportunity to pursue his chosen profession. But even if he did so allege, the nature of Plaintiff's work – providing customer service over the phone – was not so unique that he could not pursue same or similar work with another employer. Plaintiff only discusses financial difficulties, which, standing alone, are not a basis upon which to grant a request for a preliminary injunction. Shaheed Decl. at ¶¶ 1-23. Simply put, none of the factors the Ninth Circuit found persuasive in *Keene* are present here and Plaintiff cannot demonstrate irreparable harm. This Court should thus deny Plaintiff's request.

### C. PLAINTIFF HAS NOT DEMONSTRATED HE IS LIKELY TO PREVAIL ON THE MERITS

In order to prevail on a claim for failure to provide a religious accommodation, a plaintiff must show (1) he "had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of their inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). Once the plaintiff makes a prima facie failure to accommodate claim, the

1  burden shifts to the employer to demonstrate that it was unable to reasonably accommodate the
2  plaintiff's needs without undue hardship. *Bolden-Hardge v. Off. of California State Controller*,
3  63 F.4th 1215, 1224 (9th Cir. 2023).
4        Here, the City found that Plaintiff had a sincerely held religious belief that conflicted
5  with its vaccine mandate, but the City could not reasonably accommodate Plaintiff because
6  "accommodation would pose a direct threat to the health and safety of others," "accommodation
7  would prevent employee from performing essential job functions," and "accommodation would
8  result in undue hardship for the City." Dkt # 1-1 at p. 28 (Case 3:22-cv-06013 *consolidated with*
9  4:22-cv-01587 on March 13, 2023). In late June 2023, the Supreme Court clarified the standard
10 for assessing undue hardship in *Groff v. DeJoy*, 600 U.S. 447 (2023). Previously, courts
11 interpreted undue hardship to mean any effort or cost that is more than "de minimis." *Id.* at 465.
12 Under the *Groff* standard, "an employer must show that the burden of granting an
13 accommodation would result in substantial increased costs in relation to the conduct of its
14 particular business." *Id.* at 470. "What matters more than a favored synonym for 'undue
15 hardship' . . . is that courts must apply the test in a manner that takes into account all relevant
16 factors in the case at hand, including the particular accommodations at issue and their practical
17 impact." *Id.* While the Supreme Court clarified the standard, it had "no reservations in saying
18 that a good deal of the EEOC's [preexisting] guidance in this area is sensible and will, in all
19 likelihood, be unaffected by our clarifying decision today." *Id.* at 471.
20       The EEOC has provided guidance on the undue hardship standard in the context of the
21 COVID-19 pandemic which predates *Groff* but is nonetheless consistent with that decision:

> Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business—including, in this instance, the risk of the spread of COVID-19 to other employees or to the public.
>
> Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals). Another relevant consideration is . . . the cumulative cost or burden on the employer.[4]

---

[4] EEOC Guidelines, § L: "Vaccinations – Title VII and Religious Objections to COVID-19 Vaccine Mandates": https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-

-10-

*Gordon Rees Scully Mansukhani, LLP*
*315 Pacific Avenue*
*San Francisco, CA 94111*

As information about COVID-19 and vaccines data continues to develop, courts have held that "it is appropriate to confine the [undue hardship] analysis to the information available to the employer when it made its undue hardship decision." *See MacDonald v. Oregon Health & Science University*, 2024 WL 3316199 at *7 (D.Or., July 5, 2024). Here, one purpose of the vaccine mandate was so the City could have a reliable, dependable work force in the office who could perform their regular duties and disaster work if and when necessary. Wilson Dec. ¶ 5. Had he been permitted to report to work unvaccinated, Plaintiff would have posed a health and safety risk to his co-workers and supervisors. Wilson Dec. ¶ 9. This risk would have existed even if Plaintiff had observed masking and social distancing protocols. Wilson Dec. ¶ 10. The City also considered multiple accommodation options, including Plaintiff's own request to continue telecommuting full-time. However, at the time, allowing Plaintiff to telecommute full-time would have posed an undue burden due to his performance issues. See Dyer Dec. at ¶ 12. Specifically, Plaintiff made disparaging comments to his colleagues and members of the public, engaged in unprofessional conduct, slept on the job, and did not provide the requested information or assistance to callers. Dyer Dec. ¶¶ 7, 8, and 10. These performance issues precluded Plaintiff from fulfilling his essential job duties and undermined the very purpose of the 311 Call Center. In light of these issues, the City could not allow Plaintiff to continue to work from home unsupervised. See Dyer Dec. at ¶ 12.

As such, the City will be able to establish that accommodating Plaintiff's religious exemption request would have caused an undue burden in light of the risk unvaccinated employees who contracted Covid posed to others; the burden on vaccinated co-workers associated with protecting themselves against unvaccinated employees, such as, protracted masking requirements and social distancing; and the impact on the City's ability to provide services to the public. Absent a showing of a likelihood of success on the merits, which he cannot demonstrate, Plaintiff's Motion should be denied.

---

ada-rehabilitation-act-and-other-eeo-laws?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=# (last accessed October 27, 2025)

-11-

DEFENDANT'S OPPOSITION TO PLAINTIFF THADDEUS SALEEN SHAHEED'S
MOTION FOR PRELIMINARY INJUNCTION; CASE NO.: 22-cv-06013-JSW

### D. THE BALANCE OF EQUITIES AND PUBLIC INTEREST ALSO WEIGH AGAINST A PRELIMINARY INJUNCTION.

Absent a showing on the other *Winter* factors, the Court need not reach the balance of the equities and the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Even so, to support a motion for preliminary injunction, Plaintiff must show "that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. 7, 20 (2008). When a governmental entity is defending against a motion for preliminary injunction, these two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). When balancing the equities, "a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). A court must then weigh "the hardships of each party against one another." *Id.* "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24, (quotation marks omitted). But these factors also weigh against a preliminary injunction.

Here, because Plaintiff cannot show a likelihood of prevailing on the merits of his Title VII or FEHA claims, the public interest in enforcement of civil rights statutes does not weigh in favor of granting a preliminary injunction. Further, if a preliminary injunction is not issued, Plaintiff faces the harm of having been improperly denied employment. If, however, the Court were to issue a preliminary injunction that restored Plaintiff to his previous position, the City would then face the very real possibility that Plaintiff's performance issues would continue, thereby endangering the mission and purpose of the 311 Call Center in providing information or assisting the public with professionalism and courtesy. Both harms are serious, but the balance of equities does not tip in favor of Plaintiff, let alone tip sharply in his favor. Thus, the Court should not issue the requested preliminary injunction.

### IV. CONCLUSION

Plaintiff is not entitled to a preliminary injunction. He unreasonably delayed his request, failed to establish irreparable harm, and has not demonstrated likelihood of success on the merits

of his failure to accommodate claims.

Date: October 30, 2025          By: _____
                                    Michael D. Bruno
                                    Mana Koleini
                                    Pamela Ng
                                Attorneys for Defendant
                                THE CITY AND COUNTY OF SAN FRANCISCO